THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **K.A.** o/b/o her minor child, J.A. | : |
| | : |
| **Plaintiff** | : |
| v. | :    **3:12-CV-2486** |
| | :    **(JUDGE MARIANI)** |
| **ABINGTON HEIGHTS SCHOOL** | : |
| **DISTRICT,** et al. | : |
| | : |
| **Defendants** | : |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On December 13, 2012, the plaintiff, K.A., filed a Complaint on behalf of her son,

J.A. Prior to the filing of this claim, she had filed a special education due process action

against Abington Heights School District which resulted in an appeal of the Hearing Officer's

decision to this Court by the School District, and ultimately a settlement agreement between

the parties. (*See generally*, 3:12-cv-804-RDM; Release and Settlement Agreement, Doc.

23, Ex. A).

Following unsuccessful mediation proceedings in the present case, Plaintiff filed a

First Amended Complaint on June 21, 2013 (Doc. 21). Defendants subsequently moved to

dismiss on July 9, 2013. (Doc. 23). The parties have fully briefed the motion, and it is ripe

for decision. For the reasons set forth below, Defendants' motion to dismiss will be granted

in part and denied in part.

## II. FACTUAL ALLEGATIONS

Plaintiff, K.A., brings this action on behalf of her son, J.A., a student enrolled in the

Abington Heights School District (First Amended Complaint, Doc. 21, ¶¶ 4, 16) against

Defendants Abington Heights School District ("Abington Heights"); Michael Mahon,

superintendent of Abington Heights; Thomas Quinn, assistant superintendent of Abington

Heights; Michael Elia, principal of Abington Heights Middle School ("AHMS"); Eduardo

Antonetti, vice-principal of AHMS; and Brian Kelly, school counselor at Abington Heights (*Id.*

at ¶¶ 5-10 ).

Plaintiff's First Amended Complaint makes the following allegations:

J.A. was born in 1997, and later diagnosed with two neurological disorders: Attention

Deficit Disorder ("ADD") and Dysthymic Disorder (Doc. 21, ¶¶ 12-15)[1]. Beginning in 2008,

J.A. was enrolled in the Abington Heights School District, where he was provided with an

instructional support plan pursuant to Section 504 of the Rehabilitation Act of 1973 due to

his neurological disorders. (*Id.* at ¶ 16). However, K.A. avers that Abington Heights failed

to properly implement this plan. (*Id.* at ¶17).

---

[1] According to the plaintiff, ADD can include the following symptoms: "difficulty with sustaining attention span for most tasks, procrastination, trouble keeping an organized area . . ., tendency to lose things, forgetful, talks excessively, impulsive, frequently late or hurried." (Doc. 21, ¶ 14). Additionally, people who suffer from Dysthymia "often take a negative or discouraging view of themselves, their future, other people and life events." (*Id.* at ¶ 15).

On the morning of February 24, 2011, J.A. gave his friend, A.W., a quantity of "spice"[2], in exchange for a debt he owed to A.W. (Doc. 21, ¶ 36). J.A. had previously purchased this synthetic marijuana over the internet. (*Id.*). Later that same day, J.A. and A.W. reported to detention for unrelated reasons. (*Id.* at ¶¶ 35, 37). During detention, A.W. was removed by vice-principal Antonetti. (*Id.* at ¶ 37). J.A. remained in detention until approximately 4:00 p.m., after which A.W. told him that another student, W.F., had "squealed" that A.W. possessed, and had given him, "spice", causing A.W. to be searched and administrators to find a small quantity of the product on him. (Doc. 21, ¶¶ 39, 43). In turn, A.W. told the administrators that he had obtained the "spice" from J.A. (*Id.* at ¶ 40). Once J.A. left detention, A.W. contacted him and told him what had happened and that A.W.'s father had come to the school to meet with administrators. (Doc. 21, ¶ 41). W.F.'s parents were also contacted on, or around, this time. (*Id.* at ¶ 42). Despite Abington Heights' Policy that "'the parent will be contacted, the situation described and an immediate conference arranged' when a student is suspected of possessing, using, or distributing drugs, alcohol, or contraband", J.A.'s mother was not contacted on this day. (Doc. 21, ¶¶ 43, 104). Instead, J.A. was not confronted by any administrator, teacher, or counselor, and upon leaving detention, was allowed to go home. (Doc. 21, ¶ 43). However, on this same

---

[2] While "spice", a type of synthetic marijuana, is legal, it was considered to be contraband pursuant to Abington Heights' School District policy. (Doc. 21, at n. 1).

day[3], Defendants contacted detectives from the Lackawanna County District Attorney's Office to ask for assistance "in a drug investigation." (*Id.* at ¶ 44).

On February 25, 2011, immediately upon arriving at school, J.A. was approached by counselor Kelly, who asked J.A. to accompany him. (Doc. 21, ¶ 49). When J.A. arrived in Antonetti's office, Kelly told J.A. that A.W. had identified J.A. as the supplier of the "spice" found on him the prior day. (Doc. 21, ¶ 51). For approximately two to three hours, Antonetti and Kelly spoke with J.A., who ultimately admitted to bringing the "spice" to school. (Doc. 21, ¶¶ 54, 55). During this time, Principal Elia also joined the "interrogation." (*Id.* at ¶ 56). Defendants also searched J.A.'s cell phone and backpack. (*Id.* at ¶ 61).

At the end of this questioning, Kelly escorted J.A. to the school suspension room next to the vice-principal's office and told him to remain there while Kelly and Antonetti had a "private conversation." (*Id.* at ¶ 63). J.A. subsequently was returned to Antonetti's office where the vice-principal and Kelly asked him questions about his home life, including how his parents treated him and whether marijuana was used in the home. (Doc. 21, ¶¶ 65, 66). J.A. admitted that he had seen marijuana in his mother's home twice,[4] but that he did not believe she and her fiancé, J.R., used other drugs. (*Id.* at ¶¶ 67, 72). At this time, J.A. was

---

[3] Several times throughout the Complaint, including in connection with the timing of Defendants' contact with the D.A.'s office, Plaintiff states that the event occurred on February 24, 2012. In reviewing the remainder of the Complaint and supporting documentation, it is clear that Plaintiff intended to use the year 2011.

[4] In fact, according to the Affidavit of Probable Cause which Plaintiff attached to her Complaint and incorporated by reference, J.A. stated that he "and his parents have grown marijuana at home in the past", and that "his parents have marijuana in the home, and that his father regularly smokes marijuana. [J.A.] reports that his father has a very large bag of marijuana in his bedroom closet." (Doc. 21, Ex. A, at 4).

again placed in the school suspension room and remained there throughout the rest of the day, except for periodic times when he was brought back into Antonetti's office. (*Id.* at ¶¶ 73, 75). Throughout the day, Defendants were in contact with members of local law enforcement. (Doc. 21, ¶ 74). At no time was J.A. told that he could, or should, contact his parents or an attorney. (*Id.* at ¶ 92).

When J.A. failed to arrive home on the school bus at 2:15 p.m., his mother, K.A., contacted the school district. (Doc. 21, ¶ 79). She was told that J.A. was at school, that there was a problem, and that she needed to come to campus. (*Id.* at ¶ 80). Immediately after arriving at the school, police officers and law enforcement officials arrived on campus with a search warrant for K.A.'s residence. (*Id.* at ¶¶ 81, 82). She was also informed that her son was accused of selling drugs in school. (*Id.* at ¶ 81). After speaking with school officials, K.A. and J.R. were allowed to take J.A. home, under police escort. (Doc. 21, ¶¶ 84, 85). Upon arriving home, the police officers executed the search warrant and recovered a "small" amount of marijuana.[5] (Doc. 21, ¶ 85).

On March 14, 2011, J.A., K.A., and J.R., attended an expulsion hearing before the Abington Heights Board of Directors, wherein the Board found J.A. guilty of possession of contraband on school property. (Doc. 21, ¶¶ 108-110). As a result, J.A. was expelled for

---

[5] Among other things, the police recovered a container with approximately 10 grams of suspected marijuana, four plastic baggies containing 12 grams, 6 grams, 4 grams, and 2 grams of suspected marijuana respectively, and a plastic bag containing approximately 52 grams of spice. (Doc. 21, Ex. A, at 12).

the remainder of the 2010/2011 school year and the entire 2011/2012 school year. (*Id.* at ¶ 111).

Plaintiff has sued Defendants under the Fifth, Sixth, and Fourteenth Amendments, alleging that they deprived J.A. of his liberty and property interests without due process of law and discriminated against him based on his disability (Count I), that these actions constituted intentional infliction of emotional distress (Count II), that Defendants therefore breached their fiduciary duty owed to J.A. (Count III), that J.A. is entitled to punitive damages as a result of the aforementioned conduct (Count IV), and that Defendants' behavior amounted to negligence given J.A. was a disabled student and a special education student (Count V). Plaintiff is also suing Defendants under Section 504 of the Federal Rehabilitation Act, claiming that Defendants discriminated against J.A. due to his disability and failed to provide him with the same or equal protection that other non-disabled students were provided (Count VI); and brings a catch-all claim against Defendants for violations to J.A.'s civil rights provided for in Section 504 of the Rehabilitation Act of 1973, the Civil Rights Act, 42 U.S.C. § 1983, the United States Constitution, the laws of the Commonwealth of Pennsylvania, and the rules, policies, customs and procedures of the Abington Heights School District (Count VII).

## III. STANDARD OF REVIEW

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

6

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements. *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013)

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendants moved to dismiss Plaintiff's First Amended Complaint in its entirety. (Doc. 23). We will address each of the seven counts contained in the Complaint in turn.

### A. Count I: Violations of the Fifth, Sixth, and Fourteenth Amendments

Count I of the Complaint alleges violations of the Fifth, Sixth, and Fourteenth Amendments[6] by each defendant, specifically, Abington Heights School District, Mahon,

---

[6] In Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Plaintiff withdraws her claim for any violation of J.A.'s Sixth Amendment right to counsel. (Doc. 31, at 24, n. 2). Plaintiff also states that "Defendants' request that the Plaintiffs' claims pursuant to the 4th, 5th, and 14th Amendments be dismissed should be DENIED." Defendants did not request that a Fourth Amendment claim be dismissed,

Quinn, Elia, Antonetti, and Kelly. In support of this claim, Plaintiff enumerates the

constitutional rights allegedly violated by the defendants' conduct, specifically:

> a) to unabridged liberty by detaining him, without due process of the laws and in violation of the regulations, policies, practices and custom of the United States, Commonwealth of Pennsylvania and the Abington Heights School District of Lackawanna County, Pennsylvania; and
>
> b) to be free from compulsion to testify against himself in any criminal case; and
>
> c) to be deprived of property (to wit...access to an education on equal terms and conditions of his fellow students be they disabled or non-disabled) without due process of the laws, either statutory or case law, regulations, policies, practices and customs of the United States, Commonwealth of Pennsylvania and the Abington Heights School District of Lackawanna County, Pennsylvania; and,
>
> d) to be free of discrimination based upon his disability, contrary to the 5th, 6th, and 14th Amendments to the United States Constitution, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act; and,
>
> e) his liberty interest in family integrity; and
>
> f) to be protected from being taken in to custody or otherwise deprived of his freedom in any significant way and not being given the warning prescribed in *Miranda v. Arizona*, 384 U.S. 436 (1967) as further defined in *J.D.BV. North Carolina 1131 S.C.t. 2394 (2011)* [sic].

(Doc. 21, ¶ 124).

### 1. Fifth Amendment

*Miranda* decided the constitutional issue of "the admissibility of statements obtained

from a defendant questioned while in custody or otherwise deprived of his freedom of action

---

nor was any Fourth Amendment claim stated in Plaintiff's Amended Complaint. Therefore, the Court will not address a Fourth Amendment claim as the Plaintiff is no longer entitled to assert it.

in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d

694 (1966). " [T]here can be no doubt that the Fifth Amendment privilege is available

outside of criminal court proceedings and serves to protect persons in all settings in which

their freedom of action is curtailed in any significant way from being compelled to

incriminate themselves." *Id.* at 467. "In determining whether an individual was in custody, a

court must examine all of the circumstances surrounding the interrogation, but 'the ultimate

inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of

the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322,

114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler,* 463 U.S. 1121,

1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) *(per curiam*)). Additionally, the

Supreme Court has extensively examined the application of *Miranda*, and stated that:

> As used in our *Miranda* case law, "custody" is a term of art that specifies
> circumstances that are thought generally to present a serious danger of
> coercion. In determining whether a person is in custody in this sense, the
> initial step is to ascertain whether, in light of the objective circumstances of
> the interrogation, a reasonable person [would] have felt he or she was not at
> liberty to terminate the interrogation and leave. And in order to determine how
> a suspect would have gauge[d] his freedom of movement, courts must
> examine all of the circumstances surrounding the interrogation. Relevant
> factors include the location of the questioning, its duration, statements made
> during the interview, the presence or absence of physical restraints during the
> questioning, and the release of the interviewee at the end of the questioning.
>
> Determining whether an individual's freedom of movement was curtailed,
> however, is simply the first step in the analysis, not the last. Not all restraints
> on freedom of movement amount to custody for purposes of *Miranda*. We
> have decline[d] to accord talismanic power to the freedom-of-movement
> inquiry, and have instead asked the additional question whether the relevant
> environment presents the same inherently coercive pressures as the type of

station house questioning at issue in *Miranda*. Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.

*Howes v. Fields*, 132 S.Ct. 1181, 1189-1190, 182 L.Ed.2d 17, 80 USLW 4154 (2012) (internal citations and quotation marks omitted). Within this inquiry, "a child's age properly informs the *Miranda* custody analysis." *J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2399, 180 L.Ed.2d 310, 79 USLW 4504 (2011) (holding that the objective custody analysis of *Miranda* and its progeny requires consideration by police officers engaging in the interrogation of a juvenile with respect to criminal activity to take the juvenile's age into consideration in determining whether and when *Miranda* rights must be afforded). However, "[t]his is not to say that a child's age will be a determinative, or even a significant, factor in every case." *Id.* at 2406.

While the Supreme Court has made clear that "a state or local government may not unreasonably restrict certain fundamental, clearly enumerated, constitutional rights", in the public school context, "students, as unemancipated minors, do not possess all of the rights of an adult, nor do they possess such rights to the same extent as an adult, when such rights do apply." *Picarella v. Terrizzi*, 893 F.Supp. 1292, 1297 (M.D. Pa. 1995) (collecting cases). Furthermore, the procedural safeguards ensured by *Miranda* are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

Here, Plaintiff argues that Defendants acted in a police capacity, "to wit [,] they conducted a police investigation from their offices at the Abington Heights School District which included interrogation of J.A. for a period of over seven hours, incommunicado, which resulted in search warrants being issued for off campus locations . . . and an arrest of his mother and her fiancée as well as a referral to the juvenile authorities for J.A. himself."[7] (Pl.'s Br. in Opp. to Defs' Motion to Dismiss, Doc. 31, at 21). In light of these assertions, to survive Defendants' motion to dismiss the Fifth Amendment claim, Plaintiff must first plead sufficient facts that the school officials acted as agents of law enforcement before this Court can reach the issue of whether *Miranda* is applicable to this situation and whether Defendants were therefore bound by *Miranda* and its progeny.

Plaintiff's position is significantly hurt by the complete absence of citation to any case law wherein a school official alone has been found to have violated a public school student's *Miranda* rights by questioning that student on campus. Despite Plaintiff's assertions to the contrary, *J.D.B.* is not directly applicable in this case. In *J.D.B.*, a 13-year-old, seventh-grade student was removed from his classroom by a uniformed police officer, escorted to a closed-door conference room, and questioned by a police investigator for at least half an

---

[7] On February 24, 2011, A.W. received a text message from J.A. stating "Holy shit, who is the WF, I am going to beat the shit out of him. Snitches die." (Affidavit of Probable Cause, Doc. 21, Ex. A, at 4). J.A. went to the Office of Juvenile Probation in Lackawanna County, not for his possession or sale of spice, but for threatening to harm W.F., which he admitted to while speaking with school officials on February 25, 2011. (Doc. 21, ¶ 101).

Furthermore, we find it ironic that J.A.'s referral to the juvenile authorities is so troubling to him, and has caused him to suffer "emotional damage he must now live with for the rest of his life" (Doc. 21, ¶ 48), given his purported statement to Detective Thomas Davis on February 25, 2011, at his home that he "thought it would be cool to go to jail someday" (Doc. 21, Ex. A, at 12).

hour. *J.D.B.*, 131 S.Ct. at 2399. The assistant principal and the administrative intern were also present during this time. *Id.* Prior to the commencement of questioning, J.D.B. was not given *Miranda* warnings, the opportunity to speak to his grandmother, or informed that he was free to leave the room. *Id.* Ultimately, at the police investigator's request, J.D.B. wrote a statement, and was allowed to leave to catch the bus home when the bell rang. *Id.* at 2400. Five days earlier, Police had stopped and questioned J.D.B. after he was seen in the neighborhood where two home break-ins occurred, and several items were stolen. *J.D.B.*, 131 S.Ct. at 2399. On that same day, police also spoke to J.D.B.'s grandmother and his aunt. *Id.* In contrast, here, there were no police officers present, and J.A. was only questioned by school officials. Defendants were not inquiring as to a crime, but rather a violation of school policies. Further, in *J.D.B.*, petitioner was attempting to have his statements suppressed during a criminal trial, a proper remedy for a *Miranda* violation. Here, K.A. is merely attempting to invoke a *Miranda* violation to bring a civil claim - the allegation that J.A.'s *Miranda* rights were violated is not brought in connection with any criminal action.

To establish that Defendants were "acting in a police capacity", or as agents of law enforcement, and therefore bound by *Miranda* and its progeny, Plaintiff must sufficiently plead that the defendants acted as 'instruments' or agents of the state; to wit, that the police coerced, dominated, or directed the actions of the school officials. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487, 489, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564, 595 (1971).

However, if Defendants' questioning was for disciplinary purposes, and not law enforcement

purposes, "under the federal constitution, students facing disciplinary action in public

schools are not entitled to *Miranda* warnings." *Brian A. ex. rel. Arthur A. v. Stroudsburg*

*Area School Dist.*, 141 F.Supp.2d 502, 511 (M.D. Pa. 2001) (quoting *Jarmon v.*

*Batory,* 1994 WL 313063, *11 (E.D.Pa.1994) (*citing Salazar v. Luty,* 761 F.Supp. 45, 47

(S.D. Tex.1991); *Pollnow v. Glennon,* 594 F.Supp. 220, 224 (S.D.N.Y.1984), *aff'd,*757 F.2d

496 (2d Cir.1985); *Boynton v. Casey,* 543 F.Supp. 995, 997 & n. 4 (D. Me.1982)); *see also,*

*S.E. v. Grant County Bd. of Educ.*, 544 F.3d 633, 641 (6th Cir. 2008) (finding that where the

assistant principal was not acting at the behest of law enforcement, law enforcement

officers were not present, and the assistant principal's actions were reasonable under the

circumstances, he was not required to advise the student of her *Miranda* rights).

Here, J.A. was brought to vice-principal Antonetti's office by counselor Kelly, and told

that he had been identified as the source of "spice" found on another student the prior day.

(Doc. 21, ¶¶ 49, 51). As Plaintiff admits, this product is not illegal, and simply constitutes

contraband in accordance with the school's policy. (Doc. 21, at n. 1). The only facts that

Plaintiff alleges to support the claim that Defendants were acting in a law enforcement

capacity and not a disciplinary capacity is that, "[o]n February 24, 2012 [*sic*], the Defendants

herein, contacted detectives from the Lackawanna County District Attorney's Office to

respond to the District 'to assist in a drug investigation'", (Doc. 21, ¶ 44), and that "[f]rom the

morning on February 24, 2011, and concluding February 25, 2011, at approximately 4:00

P.M., the [Lackawanna County District Attorney Narcotic Unit] was in frequent contact with the administration of the ADSD, and in particular the administration of AHMS" (*id.* at ¶ 91). The mere allegation that one or more of the defendants may have spoken to a person at the LCDANU unit is insufficient to create a reasonable inference "of an attempt on [the police officers'] part to coerce or dominate [the school officials], or, for that matter, to direct [the school officials'] actions" in any way. *See Coolidge*, 403 U.S. at 489. As such, Plaintiff has failed to sufficiently plead that the questioning was for law enforcement purposes rather than disciplinary reasons.

Nonetheless, regardless of whether Plaintiff sufficiently pleaded facts as to the possibility of a Fifth Amendment violation, Defendants properly raise the defense that a *Miranda* violation is remedied by the suppression of evidence of any self-compelled incrimination, not a civil action, a claim that Plaintiff fails to contradict in her Brief in Opposition to Defendants' Motion to Dismiss. *See Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994) ("[V]iolations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself. . . . The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the "right to counsel" during custodial interrogation recognized in *Miranda v. Arizona* . . . , is merely a procedural safeguard, and not a substantive right") (internal citations omitted); *Lucero v. Gunter*, 17 F.3d 1347, 1350-1351 (10th Cir. 1994) ("*Miranda* warnings are not a constitutional right, and an officer's failure to issue *Miranda* warnings cannot form the basis

of a civil rights claim"); *see also Neighbor v. Covert*, 68 F.3d 1508, 1510-1511 (2d Cir. 1995)

("The remedy for a *Miranda* violation is the exclusion from evidence of any ensuing self-

incriminating statements.  The remedy is not a § 1983 action.  Therefore, even if [the court]

were to assume that [Plaintiff's] *Miranda* rights had been violated, that violation, standing

alone, would not form a basis for liability under § 1983.") (Internal citations omitted).

Therefore, Plaintiff's claim based upon a violation of his Fifth Amendment *Miranda* rights will

be dismissed with prejudice.

## 2. Fourteenth Amendment – Procedural and Substantive Due Process

Plaintiff alleges violations to J.A.'s procedural and substantive due process rights.

Specifically, Plaintiff claims that Defendants violated J.A.'s rights "to unabridged liberty", to

his "liberty interest in family integrity", "to be free of discrimination based upon his disability",

and not to be "deprived of property".  (Doc. 21, ¶ 124).

Procedural due process guarantees that "'[p]arties whose rights are to be affected

are entitled to be heard; and in order that they may enjoy that right they must first be

notified", and this "right to notice and an opportunity to be heard must be granted at a

meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct.

1983, 32 L.Ed.2d 556 (1972).  However,

> [t]he requirement of notice and an opportunity to be heard raises no
> impenetrable barrier to the taking of a person's possessions. But the fair
> process of decision making that it guarantees works, by itself, to protect
> against arbitrary deprivation of property. For when a person has an
> opportunity to speak up in his own defense, and when the State must listen to

what he has to say, substantively unfair and simply mistaken deprivations of
property interests can be prevented.

*Id.* at 81.

"Protected interests in property are normally 'not created by the Constitution.
Rather, they are created and their dimensions are defined' by an independent source such
as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez*, 419 U.S.
565, 572-573, 95 S.Ct. 729, 42 L.Ed2d 725 (1975) (quoting *Board of Regents v. Roth*, 408
U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "[T]he State is constrained to
recognize a student's legitimate entitlement to a public education as a property interest
which is protected by the Due Process Clause and which may not be taken away for
misconduct without adherence to the minimum procedures required by that Clause." *Id.* at
735.

In this case, it appears that Plaintiff is asserting J.A.'s property interest in a public
education, specifically, "access to an education on equal terms and conditions of his fellow
students be they disabled or non-disabled" (Doc. 21, ¶ 124(c)).  However, we do not
construe the allegations of the Complaint, whether taken separately or as a whole, to state a
claim of procedural due process.  If J.A.'s claim is founded on the principle that
J.A. was denied notice and an opportunity to be heard prior to his suspension, *see Goss*,
419 U.S. at 579 ("[a]t the very minimum. . . students facing suspension and the consequent
interference with a protected property interest must be given some kind of notice and
afforded some kind of hearing"), or that his hearing was unfair, as broadly alleged in Count

VI (Violation of Section 504 of the Federal Rehabilitation Act) it is unclear what specifically was unfair about the hearing.  Consequently, Plaintiff's Fourteenth Amendment procedural due process claim will be dismissed without prejudice.  Should Plaintiff choose to do so, she must state what procedural rights J.A. was deprived of, and the specific nature of the deprivation(s).

With respect to the substantive due process claim, Plaintiff alleges that J.A.'s "fundamental right to family integrity and liberty" was violated.  (Doc. 31, at 9).

> To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience. . . .  Deprivation violates due process only when it shocks the conscience, which encompasses only the most egregious official conduct. . . . While the meaning of the [shocks the conscience] standard varies depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision.

*Chainey v. Street*, 523 F.3d 200, 219-220 (3d. Cir. 2008) (internal citations and quotations omitted).  "As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).  Consequently, courts must be careful to observe "the Supreme Court's repeated warnings against an overly generous interpretation of the substantive component of the Due Process Clause." *Fagan v. City of Vineland*, 22 F.3d 1296, 1306 n.6 (3d Cir. 1994).

In support of her argument, Plaintiff states that Defendants violated J.A.'s rights when they "sen[t] J.A. home on February 24, 2011 with the knowledge that there was drug use in the home; not contacting the appropriate authorities, i.e., Children & Youth Services of Lackawanna County (or a similar agency), to report said unfit environment; not following the District's own reporting requirements . . . ; acting in the capacity of a police officer, in place of the statutory duty to educate children; denying J.A. access to his parents, an attorney or any third party for a period of seven hours, all of which time he was held in communicado."[8]  (Doc. 31, at 9-10).  As we have previously explained, Plaintiff has failed to allege sufficient facts to support a claim that Defendants acted in the capacity of a police officer or violated J.A.'s supposed rights to contact his parents or an attorney.  However, Plaintiff may still bring the substantive due process claim if she can establish that the defendants' conduct violated J.A.'s constitutional right to liberty in a fashion the "shocks the conscience."

Courts have applied a high standard in finding substantive due process violations sufficiently egregious to "shock the conscience", with respect to children and particularly in a public school setting.

In *United States v. Hollingsworth*, 495 F.3d 795 (7th Cir. 2007), the Seventh Circuit addressed the propriety of questioning a sixth grader in connection with her mother's

_____

[8] We find it curious, at best, that Plaintiff attempts to found her assertions on the fact that Defendants did not immediately conclude her to be an unfit parent, and did not contact Child & Youth Services, given her seeming admission that there was drug use in her home, while simultaneously complaining that J.A. was denied access to his parents and arguing that the school should have immediately contacted her.

suspected possession of marijuana. The events giving rise to the charges filed in

*Hollingsworth* are similar to the matter here in that a young student provided incriminating

information to school officials, which led to the issuance of a search warrant and the

subsequent arrest of a parent. *See id.* at 799. In *Hollingsworth*, the sixth grade student had

a poor attendance record and school officials attempted to contact the parent. *Id.* at 798.

After several unsuccessful attempts to arrange a parent teacher conference, the student

told the principal that her mother was avoiding telephone calls from the school. *Id.* The

principal then informed the student that school officials, including the truancy officer, Steve

Denny, would seek to visit the parent at home if she continued to avoid a meeting.

*Hollingsworth*, 495 F.3d at 798-99. The student told the principal that Officer Denny could

not come to the home until her mother and her boyfriend had a chance to get rid of their

"stuff" and that there were materials in the home that her mother did not want anyone to

see. *Id.* A social worker was contacted and spoke with the student, uncovering that the

"stuff" previously mentioned to the principal was marijuana, and that the student often saw it

in her home. *Id.* at 799. The student also indicated that her mother often went on drug runs

with her boyfriend, and smoked "blunts" in the home. *Id.* The social worker relayed this

conversation to Officer Denny who, in turn, informed a member of the police drug task force.

*Id.*

At trial, the district court granted the mother's motion to suppress, and noted that

"police questioning of [the student] by school personnel without her mother's knowledge,

while she was removed from class during school hours all for the sole purpose of

incriminating her mother, amount[ed] to the kind of governmental abuse of power that

'shocks the conscience.'" *Id.* The government appealed, and the Seventh Circuit reversed,

finding that the school officials' treatment of the student was constitutionally permissible.

The Court stated:

> In this case, the government's interest in speaking with [the student] was
> compelling because it had at least some reason to believe that [the parent]
> was engaged in illegal activity. *See United States v. Amerson*, 483 F.3d 73,
> 87 (2d Cir. 2007)("There can be little doubt that the government has a
> compelling interest in rapidly and accurately solving crimes. . . .").

*Hollingsworth*, 495 F.3d at 802.  Further, the Court observed that:

> [p]rotecting children from parental abuse may be more pressing than drug
> crimes, but a short interview by school officials is a minimal deprivation that
> requires little justification when it comes to avoiding a substantive due
> process violation.  [The counselor's] interview was not "without any
> reasonable justification in the service of a legitimate governmental objective."

*Id.* at 803 (internal citations omitted).  The Circuit also rejected the district court's analysis

that the government violated Hollingsworth's substantive due process rights, finding that:

> [T]the government's intrusion into the protected sphere of familial relations
> violates substantive due process only if the Due Process Clause would not
> countenance it even were it accompanied by full procedural protection. . . .
> Courts determine whether the government has violated an individual's right to
> familial relations by balancing the individual's and the state's competing
> interests. . . . In this case, the government's interest in speaking with T.H. was
> compelling because it had at least some reason to believe that Hollingsworth
> was engaged in illegal activity. . . . Hollingsworth's interest in maintaining a
> relationship with her child free from state interference is also significant, but
> school officials' intrusion on that interest was minimal.

*Id.* at 801-802.

In contrast, in *Grendell v. Gillway*, 974 F.Supp. 46 (D. Me. 1997), the District of Maine found that a police officer's threats during an interrogation at school of an eleven-year-old student that if she did not provide certain incriminating details about her parents' drug use, both she and her parents would be subject to punishment, and even prison, "shocked the conscience" and violated the child's substantive due process. *Grendell* presented a particularly egregious set of facts in that the student was told that her parents would be imprisoned absent her immediate cooperation, and that the young girl should not tell her parents that she spoke to the authorities because "often parents beat their children after the children talk to police." *Id.* at 49.

In *Lillard v. Shelby Cnty Bd. of Educ.*, 76 F.3d 716 (6th Cir. 1996), Leventhal, a teacher and girls' soccer coach, was removed from his coaching position as the result of numerous complaints, including from three female high school students. The first student, Lillard, a 14-year-old, alleged that Leventhal "held her chin with one hand and slapped her across the face". *Id.* at 719. The second student, McCarter[9] claimed that Leventhal told her that if she wanted to return to the soccer team, "she would have to 'kiss his ass' for the rest of the season"; told her "that her father was an 'asshole' and a 'liar'"; and "placed his hands between [her] breasts and fondled her buttocks on unspecified dates, and also secured duplicate keys to her room while on road trips for the soccer team." *Id.* at 720. The third student, Little, a freshman, alleged "that Leventhal abused, humiliated, and intimidated [her]

---

[9] While the other two Plaintiffs were freshman, it is unclear how old McCarter was at the time of the incidents in question.

in a number of ways, including staring at her, making 'kissing' noises, and generally

insulting her. Leventhal also telephoned [her] at home on two occasions, questioning her

about her relationships with other students and instructing her to stay away from [Plaintiff]

Lillard." *Id.* He also "sent [Little] a note asking her to come to his classroom. Shortly

thereafter, he passed her in the hallway and rubbed her stomach, telling her 'he had

arranged for permission for her to come to his class ... after her last exam'", which Little

interpreted as a sexual advance. *Id.* at 721.

The Sixth Circuit found that Plaintiffs' claims were "premised on the alleged violation

of a constitutionally protected liberty interest, within the meaning of the Fourteenth

Amendment". *Id.* at 725. While affirming in part and reversing in part the District Court's

decision, the Circuit agreed with the lower Court's determination that Leventhal's motion to

dismiss should be denied "with respect to McCarter's substantive due process claim, on the

grounds that 'fondling and touching of her breasts by Leventhal, particularly directed toward

a high school student under his direct supervision, may constitute conduct which violates

due process.' . . . [but] that Little's allegation that Leventhal rubbed her stomach while in the

school hallway, and Lillard's allegation that he grabbed her chin and slapped her face, did

not rise to the level of actions that were 'shocking to the conscience'". *Lillard,* 76 F.3d at

721. With respect to Lillard, the Circuit explained that "it is simply inconceivable that a

single slap could shock the conscience" and that Leventhal's actions "fall far short of 'brutal,'

or 'inhumane,' or any of the other adjectives employed to describe an act so vicious as to

constitute a violation of substantive due process." *Id.* at 726. As to Little, the Circuit stated:

> the incident in the hallway, while deplorable, simply is not of the outrageous
> and shocking character that is required for a substantive due process
> violation. Leventhal's rubbing of Little's stomach, accompanied by a remark
> that could reasonably be interpreted as suggestive, was wholly inappropriate,
> and, if proved, should have serious disciplinary consequences for Leventhal.
> But without more, it is not conduct that creates a constitutional claim. . . Under
> no circumstances, . . . can it amount to "a brutal and inhumane abuse of ...
> official power, literally shocking to the conscience," sufficient to state a claim
> for the violation of substantive due process rights.

*Id.*

In *Abeyta v. Chama Valley Independent School Dist.*, 77 F.3d 1253 (10th Cir. 1996),

a male teacher allegedly called a twelve-year old female student a prostitute in front of the

class and continued to whisper this name to her for the following month-and-a-half. The

teacher's comments also led to repeated taunts from classmates. *Id.* at 1255. The Tenth

Circuit stated that it was

> unwilling to hold that actions which inflict only psychological damage may
> never achieve the high level of a brutal and inhuman abuse of official power
> literally shocking to the conscience, necessary to constitute a substantive due
> process violation. . . . But we are sure that the actions alleged in the instant
> case do not reach that level—whether they were done with indifference or
> with deliberate intent to cause psychological harm. Having said this, . . . [a]
> teacher who calls a student a prostitute engages in a complete abuse of his
> authority. To do so repeatedly, and turn a deaf ear as other students follow
> the teacher's example, is flagrant misconduct.

*Id.* at 1257-1258.

In *Gottlieb ex rel. Calabria v. Laurel Highlands School Dist.*, 272 F.3d 168, 170 (3d Cir. 2001), Gottlieb, a female high school student, got into a non-physical altercation with another student. A school security officer arrived and asked Gottlieb to leave the building, but she disobeyed and continued to threaten the other student. *Id*. As a result, the officer escorted Gottlieb to the principal's office. *Id*. While she stood in the doorway of the assistant principal's office, he allegedly yelled at Gottlieb, told her to "shut up, because he didn't want to hear nothing [*sic*][s]he had to say", and pushed her backwards into a door jam. *Id*. at 170-171. As a result, Gottlieb's lower back struck the door jam, causing her chronic back pain. *Id*. at 171. The Third Circuit stated that Gottlieb's action was one of excessive force, not unreasonable detention, but that for corporal punishment in public schools to be violative of § 1983, it must be inspired by malice or sadism, which impliedly invokes the shocks the conscience standard. *Id*. at 172 (citing *Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir.1988)). The Circuit therefore held that the assistant principal's actions of "placing his hand on a student's shoulders and moving her mere inches is not a brutal and inhumane abuse of official power literally shocking to the conscience." *Gottlieb*, 272 F.3d. at 175.

In *S.M. v. Lakeland School Dist.*, 148 F.Supp.2d 542, 544 (M.D. Pa. 2001), *aff'd*, 33 Fed.Appx. 635 (3d Cir. 2002), a teacher chastised a fifth grade student in front of the class who was having trouble completing math problems at the board. The teacher repeatedly asked the student, "in a loud voice, why she did not know the answer, and what the answer

was [, and] . . . had his finger in her face as she was standing by her desk." *Id.* at 544-545. The student began crying and exclaimed, "Jesus Christ, stop yelling at me. You're driving me crazy." *Id.* at 545. The teacher initially told the student to leave, but changed his mind, "came close to [the student's] face and said 'Don't ever say that in the classroom.' At no time did [he] physically touch [the student]." *Id.* After class, the student left the classroom crying, and went to the nurse's office to call her mother. *Id.* According to the student's mother, the child "was very distraught and nervous that evening. She had difficulty sleeping the night of the incident." *Id.* The next day, she "developed hives, for which she sought treatment, and also complained of a nervous stomach, which lasted for a day or two." *Id.* Despite the fact that "[f]rom time to time, parents of students in his classes . . . complained about his teaching and disciplinary techniques", *S.M.,* 148 F.Supp.2d at 543, the Court found that

> [the teacher's] conduct, although unfortunate, is not conscience shocking. . .
> Plaintiff has not established how [the teacher's] conduct, even if considered
> inappropriate, could be construed as sadistic or malicious. [He] may have
> been overzealous in conducting his class, but his conduct could not be
> termed "brutal." Even if done in a loud and confrontational manner, [the
> teacher's] behavior could not be considered as offensive as the behavior of
> the teacher in *Abeyta*.
>
> Additionally, the emotional trauma and subsequent physical manifestations of
> that trauma that [the student] apparently suffered as a result of the incident
> could not reasonably be considered severe. This is especially true when [the
> student's] injuries are compared to those of plaintiffs who suffered some
> form of physical abuse at the hands of a teacher, and yet were found not to
> have suffered a violation of a constitutional right. *See Kurilla v. Callahan,* 68
> F.Supp.2d 556 (M.D.Pa.1999) (striking student in chest which resulted in
> bruising did not constitute a violation of substantive due process); *Jones [v.*

*Witinski,* 931 F.Supp. 364, 369 (M.D.Pa.1996)], (teacher grabbing student by the arm and pulling him across the desk resulting in bruising and other physical injures did not rise to level of a substantive due process violation); *Lillard,* 76 F.3d 716 (6th Cir. 1996) (single slap with no resulting physical injury was not a constitutional violation); *Brooks v. School Board of Richmond,* 569 F.Supp. 1534 (E.D.Va.1983) (pricking student in arm with a straight pin was not a constitutional violation).

*Id.* at 548-459.

In the present matter, as of February 24, 2011, J.A. was aware that A.W. had told school officials that J.A. had provided him with "spice"; and on February 25, 2011, J.A. was brought into the vice-principal's office, admitted to bringing the "spice" to school, identified other individuals who may have also been using or possessing drugs, answered questions about his home life, and admitted to having seen marijuana in his mother's home. (Doc. 21, ¶¶ 41, 51, 54, 59, 60, 67). During this seven hour "detention", J.A. allegedly cried multiple times, and was reluctant to answer the questions posed by several of the defendants. (*Id.* at ¶¶ 52, 58, 67). Unlike in *Grendell,* the complaint makes no direct allegations that J.A. was lied to, threatened, coerced, or bribed into providing this information, but instead seemingly implies such threats through assertions that J.A. suffered from certain mental disabilities,[10] did not use the restroom out of fear of asking for permission, and ultimately spent over seven hours in "the confines of the vice principal's office and/or the in-school

---

[10] We are hesitant to believe that a student's ADD diagnosis would render him less capable than a "non-disabled" student of understanding the situation in which he found himself, but accepting Plaintiff's allegations as true at this stage, we consider it a factor which, when considered in conjunction with the other alleged facts, may render Defendants' conduct more serious.

suspension area." (Doc. 21, ¶¶ 58, 77, 97).  At no time was he told that he could call his

parents or an attorney.  (*Id.* at ¶ 92).

In light of the aforementioned compilation of case law, these allegations alone

cannot rise to the level of conscience-shocking.  The Third Circuit has held that "malice or

sadism" is a requisite for a finding of conscience-shocking behavior with respect to corporal

punishment, *see Gottlieb, supra*, and numerous Courts' have demonstrated reticence in

finding that psychological damage that does not reach the level of "a brutal and inhuman

abuse of official power", can shock the conscience, *see Abeyta, Lillard, Gottlieb, supra*.

Consequently, in the absence of any allegations of physical harm perpetrated upon J.A. by

the defendants, Plaintiff faces an exceedingly high burden in demonstrating that the school

officials' actions could be termed "brutal" or encompass "the most egregious official

conduct", as required by *Chainey*.

In addition to Plaintiff's factual allegations regarding J.A.'s treatment, the Court must

also consider that, unlike in *Hollingsworth* and all other cases examined by the Court

concerning similar situations, J.A. was not "briefly" detained, and therefore subject to only a

"minimal deprivation" requiring "little justification when it comes to avoiding a substantive

due process violation", *Hollingsworth*, 495 F.3d at 803, and that despite the Abington

Heights School District Policy that "'the parent will be contacted, the situation described and

an immediate conference arranged' when a student is suspected of possessing, using, or

distributing drugs, alcohol, or contraband", J.A.'s mother was not contacted at any time on

28

February 24 or February 25, 2011, prior to her phone call to the school on February 25. (Doc. 21, ¶¶ 43, 104).

However, in addition to the absence of any physical punishment or threats or coercion, which significantly decreases the possibility of conscience shocking behavior, the school had several legitimate, if not compelling, reasons for their "detention" and questioning of J.A.  While we deem the length of J.A.'s "detention" and Abington Heights' failure to follow its own policies as factors to be considered when determining whether Defendants' conduct was sufficiently egregious such as to "shock the conscience", particularly when viewed in conjunction with J.A.'s special education requirements, these factors must be balanced with the government's interests.  A public school has a compelling interest in preventing a child from being exposed to unlawful drug use, or other illegal activity, by his or her parents. *See Hollingsworth, supra.*  It would be irrational to assert that when a school official suspects a student of possessing, using, or distributing drugs, alcohol, or contraband, that official must always immediately contact a child's parent or guardian prior to speaking with the child and first ascertaining the surrounding factual situation.  Further, by the morning of February 25, 2011, the school officials were aware of the text message from J.A. to A.W. stating "Holy shit, who is the WF, I am going to beat the shit out of him.  Snitches die." (Doc. 21, Ex. A, at 4).[11]  Here, Abington Heights, and its officials, had reason to be concerned not only for the welfare and safety of J.A. at home, but

---

[11] The Affidavit of Probable Cause states that on February 24, 2011, A.W's father allowed Principal Elia to read the messages on A.W.'s phone, including this text.  (Doc. 21, Ex. A, at 4).

also for the impact on other students to whom J.A. was giving and/or selling the contraband, as well as the physical safety of another student. *See New Jersey v. T.L.O.*, 469 U.S. 325, 339-340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. . . . Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship") (internal citations omitted)).

Even in the absence of any government interest, Plaintiff's allegations could not be considered sufficiently egregious to rise to the level of conscience-shocking. If the Court were to apply the recognized standard for corporal punishment, Defendants' conduct clearly cannot be reasonably considered malicious or sadistic. In the context of Plaintiff's claims, which are devoid of any suggestion that J.A. was physically harmed or abused at the time of his "detention" and "interrogation" by Defendants, there are still no sufficient allegations to constitute conscience-shocking behavior. Plaintiff fails to appropriately allege that J.A. was

lied to, threatened, coerced, or that Defendants' conduct was a brutal and inhuman abuse of

official power to support his conclusory claim that this conduct caused him to suffer

"emotional damage he must now live with for the rest of his life" (Doc. 21, ¶ 48).

Further, in light of the government's interest in maintaining order and discipline in the

school, together with the compelling need to prevent children from being exposed to

unlawful drug use by their parents, and to protect other school children, it is abundantly

clear that any claim that Defendants violated J.A.'s right to family integrity and liberty, or that

the defendants' failure to obtain parental consent before J.A. was questioned by school

officials violated his rights, must be dismissed.  Plaintiff has failed to provide sufficient

plausible allegations that the school officials' actions sufficiently "shock the conscience" to

support a substantive due process claim under the Fourteenth Amendment.

Consequently, Plaintiff's Fifth Amendment and Fourteenth Amendment substantive

due process claims will be dismissed with prejudice.  Plaintiff's Fourteenth Amendment

procedural due process claim will be dismissed without prejudice.

### B. Counts II, III, V - State Law Claims

Counts II, III, and V of the Complaint allege Intentional Infliction of Emotional

Distress, Breach of Fiduciary Duty, and Negligence, respectively, against each defendant,

specifically, Abington Heights School District, Mahon, Quinn, Elia, Antonetti, and Kelly.  We

understand the allegations in these three counts to be state law claims under Pennsylvania

law.  However, to the extent that the counts were asserted for the purpose of alleging claims

of conduct pursuant to school district policy, rule, regulation, or custom so that liability under

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) would

follow, the claims fail because Plaintiff makes no allegations of any specific policy, rule,

regulation, or custom by Abington Heights pursuant to which the alleged conduct was

undertaken.

### 1. Count II – Intentional Infliction of Emotional Distress

Defendants argue that they are immune from suit with respect to Count II (Intentional

Infliction of Emotional Distress).  (Doc. 23, ¶ 38).  Pursuant to the Political Subdivision Tort

Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 *et seq.* ("PSTCA"), a local agency cannot be

held "liable for any damages on account of any injury to a person or property caused by any

act of the local agency or an employee thereof or any other person."  42 Pa. Cons. Stat.

Ann. § 8541.  The Act provides for eight exceptions to this rule: (1) vehicle liability; (2) care,

custody or control of personal property; (3) real property; (4) trees, traffic controls and street

lighting; (5) utility services facilities; (6) streets; (7) sidewalks; and (8) care, custody or

control of animals.  42 Pa. Cons. Stat. Ann. § 8542(b).  Additionally,

> "[m]unicipal employees, including school district employees, are generally
> immune from liability to the same extent as their employing agency, so long
> as the act committed was within the scope of the employee's employment.  42
> Pa. Cons.Stat. § 8545.  However, there is an exception to this general rule:
> Employees are not immune from liability under § 8545 where their conduct
> amounts to 'actual malice' or 'willful misconduct'".

*Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006).  The Pennsylvania Supreme Court has

recognized willful misconduct as requiring a demanding level of fault.  *Id.*  "Willful

misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied.'" *Id.* (quoting *Renk v. City of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994)).

Plaintiff contends that Defendants' motion to dismiss the IIED claim on the grounds of immunity is untimely given that no discovery has yet to be conducted. (Doc. 31, at 20). However, Plaintiff provides no case law for this proposition, and Courts within this Circuit have found otherwise. *See Kessler v. Monsour,* 865 F.Supp. 234 (M.D. Pa. 1994) (granting Defendants', a school superintendent, school principal, and school district, motion to dismiss Plaintiffs' claim for intentional infliction of emotional distress). Consequently, given that the claim for IIED against Abington Heights does not fall within any of the eight exceptions to the PTSA, it must be dismissed as to this Defendant. With respect to the individual Defendants, although the claim does not fall within one of the eight enumerated exceptions to the PTSCA, by the very nature of the tort, it is a claim of willful misconduct, which would operate to deprive these Defendants of immunity under the PTSA.

Assuming that the allegations of the tort of IIED are synonymous with an allegation of willful misconduct, so that Mahon, Quinn, Elia, Antonetti, and Kelly acted with "actual malice" or "willful misconduct", thereby preventing immunity from attaching, for Plaintiff to prevail on her claim for intentional infliction of emotional distress, she must show that the conduct of these Defendants was "intentional, outrageous or extreme conduct" and caused

J.A. severe emotional distress. *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005).

"Outrageous or extreme conduct has been defined by the appellate courts of this

Commonwealth as conduct that is so outrageous in character, so extreme in degree, as to

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in civilized society." *Id.* (internal quotation marks omitted). "With regard to the

element of outrageousness, it is for the court to determine in the first instance whether the

defendant's conduct may reasonably be regarded as so extreme and outrageous to permit

recovery." *Id.* at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional
> infliction of emotional distress have . . . presented only the most egregious
> conduct. *See*[,] *e.g., Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970)
> (defendant, after striking and killing plaintiff's son with automobile, and after
> failing to notify authorities or seek medical assistance, buried body in a field
> where discovered two months later and returned to parents (recognizing but
> not adopting section 46)); *Banyas v. Lower Bucks Hospital*, 437 A.2d 1236
> (Pa. Super. Ct. 1981)(defendants intentionally fabricated records to suggest
> that plaintiff had killed a third party which led to plaintiff being indicted for
> homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir.
> 1979)(defendant's team physician released to press information that plaintiff
> was suffering from fatal disease, when physician knew such information was
> false).

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998). Furthermore, a plaintiff must demonstrate

physical injury or harm to sustain a cause of action for intentional infliction of emotional

distress. *Fewell v. Besner*, 664 A.2d 577, 582 (Pa. Super. Ct. 1995) (citing *Kazatsky v. King*

*David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) ("Those truly damaged should have

little difficulty in procuring reliable testimony as to the nature and extent of their injuries. . . .

[A]t the very least, existence of the alleged emotional distress must be supported by competent medical evidence.")); *Crivellaro v. Pennsylvania Power and Light Co.*, 419 A.2d 207 (Pa. Super. Ct. 1985) (finding that symptoms of depression, nightmares, anxiety requiring psychological treatment, and . . . ongoing mental, physical and emotional harm sufficiently stated physical manifestations of emotional suffering to sustain a cause of action).

Similar to our analysis of Plaintiff's substantive due process claim, Plaintiff fails to allege any conduct, whether singly or in combination, that rises to the requisite level of "outrageous or extreme." The essence of Plaintiff's factual basis for this claim is that Defendants held J.A. in the in-school suspension room and Antonetti's office for over seven hours, questioned him during this time period, and did not allow him to call his parents or an attorney, or inform him of his alleged right to do so. Plaintiff's additional claims that J.A. was subjected to IIED because Defendants created an "environment of oppression, fear and terror", were conducting a criminal investigation, and violated "established law" (Doc. 21, ¶¶ 138, 141) are entirely conclusory and provide no support for Count II. Accordingly, it is clear that Plaintiff has failed to allege sufficient facts to establish that Defendants' conduct could be deemed sufficiently egregious to be outrageous or extreme. Therefore, the Court will grant Defendants' motion to dismiss this Count with prejudice.

## 2. Count III: Breach of Fiduciary Duty

A fiduciary duty is created by "[t]he basic duties which arise from the teacher-student

relationship . . . [including] a duty to supervise, a duty to exercise good judgment, and a duty

to instruct as to correct procedures, particularly, not but [sic] exclusively, when potentially

hazardous conditions or instrumentalities are present, and these basic duties must co-exist

with the whole purpose for the teacher-student relationship." *Vicky M. v. Northeastern*

*Educational Intermediate Unit 19*, 486 F.Supp.2d 437, 458 (M.D. Pa. 2007).   To establish a

breach of a fiduciary duty, the plaintiff must prove: (1) that the defendant negligently or

intentionally failed to act in good faith and solely for the benefit of the plaintiff in all matters

for which he was employed, or negligently or intentionally failed to use reasonable care in

carrying out his duties; (2) that the plaintiff suffered injury; and (3) that the agent's failure to

act solely for the plaintiff's benefit, or to use the skill and knowledge demanded of him by

law, was a real factor in bringing about the plaintiff's injuries.  Pa. S.S.J.I. (Civ.) § 6.210

(2013).

Similarly to Count II, Defendants' motion to dismiss Count III against Abington

Heights will be granted.  Plaintiff's state law claim for breach of fiduciary duty does not fall

within one of the eight exceptions to the PSTCA, and will therefore be dismissed with

prejudice.

The claim of breach of fiduciary duty with respect to Elia, Antonetti, and Kelly, will not be dismissed.[12]  The Amended Complaint alleges that Defendants breached their fiduciary duty to J.A. "by, not only denying him his right to liberty, equal protection, and due process, as well as, failure to follow the student's rights pursuant to '*Miranda*,' but also by discriminating against J.A. based upon his disability." (Doc. 21, ¶ 150).  This claim necessarily implicates willful misconduct such as to prevent immunity from attaching.  As explained in Section IV(A), Plaintiff has failed to allege sufficient facts to establish violations of J.A.'a right to liberty, equal protection, due process, Fifth Amendment, or that he was discriminated against due to his ADD and/or Dysthymic Disorder.[13]  However, while Plaintiff has not alleged any constitutional violation, she has marginally met the *Twombly* pleading standard and put forth sufficient factual allegations as to the existence of a fiduciary duty between J.A. and the individual defendants, a breach of this duty, and the presence of willful misconduct, so as to state a non-constitutional state law cause of action and therefore warrant a denial of Defendants' motion to dismiss as to the above-named individual Defendants.

### 3. Count V: Negligence

As with Counts II and III, Count V is a state law claim that does not fall within one of the eight exceptions to the PSTCA.  In light of this, the individual defendants would only lose

---

[12] As discussed in Section IV(F), *infra*, Defendants Mahon and Quinn will be dismissed without prejudice with respect to all Counts of the Complaint that have either not been dismissed or wherein the plaintiff has been granted leave to amend.

[13] We have also engaged in an analysis of Plaintiff's claims regarding discrimination in Section IV(D), *infra*.

their immunity if their conduct amounted to "actual malice" or "willful misconduct." Given

that both of these requirements necessarily require a higher level of fault than mere

negligence, this claim fails as a matter of law and this Count will be dismissed with prejudice

against Abington Heights, Mahon, Quinn, Elia, Antonetti, and Kelly.

Additionally, to the extent that Plaintiff attempts to argue (albeit very briefly) that this

Count "properly flow[s] from the Plaintiffs' Section 1983 claims" (Doc. 31, at 20), she does

not assert the requisite facts showing a policy, rule, or custom pursuant to which any of the

alleged negligent, careless, or reckless conduct was undertaken.

### C. Count IV: Punitive Damages

Count IV of Plaintiff's Complaint requests punitive damages against each defendant,

specifically, Abington Heights School District, Mahon, Quinn, Elia, Antonetti, and Kelly.

To recover punitive damages in a §1983 action, Plaintiff must show that the

defendant's conduct was "motivated by evil motive or intent, or . . . involve[d] reckless or

callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30,

56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Pennsylvania law mirrors this standard:

> Punitive damages may be awarded for conduct that is outrageous, because
> of the defendant's evil motive or his reckless indifference to the rights of
> others. Punitive damages must be based on conduct which is 'malicious,'
> 'wanton,' 'reckless,' 'willful,' or 'oppressive'. Further, one must look to the act
> itself together with all the circumstances including the motive of the
> wrongdoers and the relations between the parties. The state of mind of the
> actor is vital. The act, or the failure to act, must be intentional, reckless or
> malicious.

*Feld v. Merriam*, 485 A.2d 742, 747-748 (Pa. 1984) (internal citations and quotation marks omitted).

The Supreme Court has specifically held that a municipality is immune from punitive damages under 42 U.S.C. § 1983 unless expressly authorized by statute. *City of Newport v. Facts Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Further, individual defendants sued in their official capacity are also immune from punitive damages. *See Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). In response to Defendants' motion to dismiss on this Count, Plaintiff seemingly acknowledges this point by failing to address the application of punitive damages to Abington Heights or the defendants in their official capacity, and instead only addressing the availability of punitive damages against the defendants sued in their individual capacity (Doc. 31, at 21). Consequently, Count IV will be dismissed with prejudice as to Abington Heights.

The claim for punitive damages with respect to Elia, Antonetti, and Kelly, will not be dismissed.[14] While the plaintiff has barely "nudged [her] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, she has sufficiently alleged facts to warrant a denial of Defendants' motion to dismiss, as to the aforementioned individual Defendants, for the causes of actions that we will allow to remain.

### D. Count VI: Violation of Section 504 of the Federal Rehabilitation Act

---

[14] As previously explained and further discussed in Section IV(F), *infra*, Defendants Mahon and Quinn will be dismissed without prejudice with respect to all Counts of the Complaint that have either not been dismissed or wherein the plaintiff has been granted leave to amend.

Plaintiff alleges that all of the defendants violated Section 504 of the Federal

Rehabilitation Act by discriminating against J.A. because of his disability, "in that they failed

to provide him with the same and/or equal protection that other non-disabled students were

provided", deprived him of "his liberty, right to a free and appropriate education . . . his right

to equal protection from the law, . . . , [and] his right to be free from self-incrimination without

due process of law".  (Doc. 21, ¶ 174).

Defendants put forth several arguments in support of their motion to dismiss this

Count, the most persuasive of which are as follows: (1) Plaintiff cannot bring a Section 504

claim against the individual defendants (Br. in Supp. of Defs' Motion, Doc. 26, at 27); (2)

Plaintiff has failed to state a cause of action for a violation of § 504 (Doc. 23, ¶ 49); and (3)

the Release and Settlement Agreement settles "all claims under § 504 of the Rehabilitation

Act and the ADA based upon, or arising out of the student's 504 Plans, educational

programming, and/or educational placement" (id. at ¶¶ 55, 56).

Section 504 provides in relevant part:

> No otherwise qualified individual with a disability in the United States, . . .
> shall, solely by reason of his or her disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to discrimination
> under any program or activity receiving Federal financial assistance. . .

29 U.S.C. § 794(a).

As a preliminary matter, Defendants are correct that Plaintiff is precluded from

bringing a Section 504 claim against the individual defendants. *See Emerson v. Thiel*

*College*, 296 F.3d 184, 190 (3d Cir. 2002) ("It is undisputed that Thiel [College] is the

recipient of federal financial assistance. Because the individual defendants do not receive

federal aid, [Plaintiff] does not state a claim against them under the Rehabilitation Act");

*A.W. v. Jersey City Public Schools*, 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be brought

pursuant to Section 504 against recipients of federal financial assistance, but not against

individuals"). Therefore, Count VI will be dismissed with prejudice with respect to the

individual defendants. The Section 504 claim may only be asserted against Abington

Heights.

Second, as previously discussed, Plaintiff has failed to allege sufficient facts to

support a claim that his "right to be free from self-incrimination" was violated, that he was

denied an impartial hearing, or that such denial was the result of his disability.[15] In

reviewing the Count VI of the Complaint, the only allegations that now need to be analyzed

in the context of a possible violation of Section 504 are Plaintiff's claims that Defendants

failed to provide him with the same and/or equal protection as other "non-disabled"

students.

To establish a violation of Section 504, a Plaintiff must show that "(1) he is 'disabled'

as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the

school or the board of education receives federal financial assistance; and (4) he was

---

[15] As previously stated, it is unclear what Plaintiff contends was not impartial about the hearing, or, for that matter, what hearing is being referred to. But more importantly with respect to this Count, Plaintiff also fails to provide any foundation for her statement that, even if J.A. was deprived of an impartial hearing, this was due to his disability. Plaintiff's statement that "the District routinely denied disabled students the statutory right to an 'impartial hearing' and specifically when the student holds a '504 plan'" (Doc. 21, ¶ 178) lacks any factual support.

excluded from participation in, denied the benefits of, or subject to discrimination at, the

school." *Andrew M. v. Delaware Cnty. Office of Mental Health & Mental Retardation,* 490

F.3d 337, 350 (3d Cir.2007) (quoting *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 253

(3d Cir.1999), *superseded by statute on other grounds as recognized by D.F. v.

Collingswood Borough Bd. of Educ.,* 694 F.3d 488 (3d Cir. 2012)).  In addition, '[t]he state

must have failed to provide the service for the sole reason that the child is disabled."

*Andrew M.,* 490 F.3d at 350.

The Complaint sufficiently alleges facts to establish that Plaintiff has met the second

and third necessary factors, and Defendants do not appear to take issue with the factual

sufficiency of either of these elements.  However, with respect to the first element,

Defendants contend that "Plaintiffs have failed to allege sufficient facts to establish that J.A.

was disabled pursuant to Section 504 on February 24 or 25 [and] Plaintiff has not alleged

notice to the District or the existence of a 504 plan." (Doc. 26, at 23).  As to the fourth

element, Defendants argue that the Amended Complaint "fails to allege any facts which

indicate that J.A.'s disability was the cause of the discrimination or denial of benefits, or that

the District failed to provide required services to J.A. for the sole reason that he is disabled

during the investigation." (Doc. 26, at 23).

With respect to whether Plaintiff failed to sufficiently allege that J.A. was disabled

pursuant to Section 504 in February, 2011, we agree with Defendants.  Plaintiff correctly

contends that the Amended Complaint, ¶ 20, incorporates by reference Exhibit B of the

Complaint from the prior case, 12-cv-804, which purportedly contains a stipulation by both parties that "the student was receiving the benefits of a Section 504 Plan." (Doc. 31, at 4). However, incorporating attachments from a prior complaint and case is an unacceptable method of pleading, and we do not consider it sufficient for Plaintiff to meet her burden as to the first element. This insufficiency, in conjunction with the absence of any allegations that establish a plausible connection between Plaintiff's treatment and expulsion and his disability requires dismissal of Plaintiff's claim under the Rehabilitation Act. We will grant leave to amend one last time only because we are mindful of Third Circuit precedent that leave to amend should be granted unless it would be futile or inequitable. *Phillips*, 515 F.3d at 245.

Similarly to Plaintiff's claim that J.A. did not receive an impartial hearing, discussed in Section IV(A)(2), *supra*, Plaintiff's allegations with respect to discrimination based on J.A.'s disability lack a sufficient basis. The *only* non-conclusory fact that Plaintiff presents is that the parents of both "non-disabled" students, A.W. and W.F., were called on February 24, 2011, but K.A. was not (Doc. 21, ¶¶ 41, 42, 43). In their brief opposing the motion to dismiss, Plaintiff also points to the administrative proceedings involving J.A., wherein Defendant Mahon purportedly "testified that students with a disability that results in them having a 504 Plan are commonly denied a statutorily created right to a hearing, prior to disciplinary sanctions being imposed." (Doc. 31, at 3). Plaintiff supports this contention by attempting to incorporate the transcript which was attached to the Complaint in the prior

case, which has now been settled. However, no reference to Mahon's statement is found in the current Amended Complaint before this Court, and the Court is unable to verify the extent to which Plaintiff's characterization of Mahon's statement is correct, if at all. Simply attempting to incorporate an attachment to Plaintiff's Complaint in the prior case, and only first referencing the alleged statement in her brief, is impermissible and fails to offer any support to Plaintiff's arguments.

Because Plaintiff has failed to state a claim for a violation of the Rehabilitation Act, it is inappropriate at this stage for the Court to determine whether The Release and Settlement, signed by K.A. and Abington Heights as a result of the prior case, releases the school district from some, or all, of the claims within this Count. An examination of the contours of the release, and which, if any, of Plaintiff's claims are non-educational in nature and arise from the February 24 and February 25, 2011, investigation, and are therefore not explicitly released, is premature and must await the significant clarifications this Court expects from the Second Amended Complaint that this opinion allows. (*See* Release and Settlement Agreement, Ex. A., Doc. 23, at 7).

Consequently, Count VI is dismissed against the individual Defendants with prejudice, but dismissed against Abington Heights without prejudice. To sufficiently establish a cause of action for a violation of Section 504, Plaintiff will have to establish that (1) J.A. was disabled pursuant to Section 504 in February, 2011; (2) the manner in which he was expelled was based on his disability; (3) he was treated differently in the hearing due to

his disability; and (3) the school officials' actual decision to expel him was due to his disability.

### E. Count VII: Violation of Civil Rights

With respect to Count VII, Plaintiff alleges that all Defendants "failed to provide J.A. his constitutionally protected rights . . . as well as his due process rights pursuant to Section 504 of the Rehabilitation Act of 1973." (Doc. 21, ¶ 184). These claims are redundant with respect to the entire complaint. In her Brief in Opposition to Defendant's Motion to Dismiss, Plaintiff fails to address this issue, properly raised by the Defendants, and offers no insight as to how she believes Count VII differs from the prior counts, and Count I in particular. Furthermore, even if the Court were to not dismiss this Count, as previously discussed, Plaintiff has failed to make allegations of any specific policy, rule, regulation, or custom by Abington Heights pursuant to which the alleged conduct was undertaken as required under *Monell*.

Consequently, Count VII will be dismissed with prejudice.

### F. Defendants' Motion to Dismiss Mahon and Quinn

Finally, Defendants argue that Defendants Mahon and Quinn must be dismissed with prejudice because "Plaintiff has failed to allege any actionable conduct attributable to those defendants." (Doc. 26, at 33). Aside from repeatedly naming Superintendent Mahon and Assistant Superintendent Quinn in the list of Defendants, Plaintiff never attributes any specific conduct or statements to Mahon or Quinn, nor establishes that either defendant

"participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572 (3d Cir. 2004) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-1191 (3d Cir. 1995)). In the complete absence of any factual allegations against Mahon and Quinn, all claims against them will be dismissed. However, this dismissal will be without prejudice, solely for the reason that, with respect to the individual defendants, Plaintiff has been granted leave to amend Count I, as to the Fourteenth Amendment procedural due process claim, and Counts III (Breach of Fiduciary Duty), and IV (Punitive Damages).

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 23). A separate Order follows.

Robert D. Mariani
United States District Judge