**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JACOB ANDERSON** | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:12-CV-2486** |
| | : | **(JUDGE MARIANI)** |
| **ABINGTON HEIGHTS SCHOOL** | : | |
| **DISTRICT,** et al. | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

### I.  INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court are Defendants' Motion for Summary Judgment (Doc. 96)

and Plaintiff's Motion for Partial Summary Judgment (Doc. 93).

On December 13, 2012, K.A., filed a Complaint on behalf of her son, J.A.,[1] against

Defendants Abington Heights School District ("AHSD"), Michael Mahon, Ph.D., Thomas

Quinn, Ph.D., Sam Sica, Michael Elia, Eduardo Antonetti, and Brian Kelly. (Doc. 1).

Prior to the filing of the present action, K.A. had filed a special education due

process action against Abington Heights School District which resulted in an appeal of the

Hearing Officer's decision to this Court by the School District, and ultimately a settlement

---

[1] At the time the action was filed, Jacob Anderson ("J.A.") was a minor.  Since that time, J.A. has reached the age of majority.  As a result, K.A. no longer has standing in this action and J.A. has been substituted as the plaintiff in this action.

agreement between the parties.  (*See generally*, 3:12-cv-804-RDM (M.D. Pa. 2012); Release and Settlement Agreement).[2]

Following unsuccessful mediation proceedings in the present case, Plaintiff filed a First Amended Complaint on June 21, 2013 (Doc. 21)[3] which Defendants moved to dismiss (Doc. 23).  The Court granted in part and denied in part Defendants' motion.  The Court dismissed with prejudice Plaintiff's Fifth Amendment claim, Fourteenth Amendment substantive due process claim, intentional infliction of emotional distress claim, negligence claim, and civil rights claim, and dismissed Plaintiff's Fourteenth Amendment procedural due process claim without prejudice.  The Court also dismissed with prejudice Plaintiff's breach of fiduciary duty and punitive damages claims as to Abington Heights School District, dismissed these claims without prejudice as to Defendants Mahon and Quinn, and allowed these two claims to proceed against Defendants Antonetti, Elia, and Kelly.  Finally, the Court dismissed with prejudice Plaintiff's Section 504 of the Federal Rehabilitation Act claim as to Defendants Mahon, Quinn, Elia, Antonetti, and Kelly, but dismissed this claim without prejudice as to Abington Heights School District.  (*See* Docs. 43, 44).

Plaintiff timely filed a Second Amended Complaint (Doc. 47) and Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 50).  The Court granted in

---

[2] The prior action re-instated J.A. at Abington Heights and provided an array of support systems, including a compensatory education fund, to help him progress in his education.  Plaintiff now only requests financial compensation.

[3] Plaintiff's Amended Complaint was brought against the same Defendants as in the original Complaint, with the exception of Sam Sica, who was no longer a named Defendant.

part and denied in part Defendants' motion. Specifically, the Court dismissed with prejudice Plaintiff's Fourteenth Amendment procedural due process claim with respect to violations of J.A.'s liberty interest; dismissed with prejudice Plaintiff's claims for breach of fiduciary duty and punitive damages against Defendant Mahon, and dismissed Defendant Quinn in his entirety. The Court denied Defendants' motion to dismiss Plaintiff's Fourteenth Amendment procedural due process claim with respect to violations of J.A.'s property interest and Defendants' motion to dismiss Plaintiff's claim for violations of Section 504 of the Rehabilitation Act. (*See* Doc. 64).

As a result of the Court's rulings, the following claims remain in this action: Violations of the Fourteenth Amendment, specifically Plaintiff's procedural due process claim for violations of his property interest, against Defendant AHSD and Defendants Mahon, Elia, Antonetti, and Kelly in their individual capacities (Count I); Breach of Fiduciary Duty against Defendants Elia, Antonetti, and Kelly (Count II); Punitive Damages against Defendants Elia, Antonetti, and Kelly (Count III); and Violations of Section 504 of the Rehabilitation Act against Defendant AHSD (Count IV).

The parties have now filed cross-motions for summary judgment. (Docs. 93, 96). Plaintiff's motion requests that the Court grant summary judgment with respect to Count IV of the Second Amended Complaint for violations of Section 504. Defendants' motion requests summary judgment on all remaining Counts of the Second Amended Complaint.

The parties have fully briefed the motions, and they are ripe for decision. For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment (Doc. 96) and deny Plaintiff's Motion for Partial Summary Judgment (Doc. 93).

## II. STATEMENT OF UNDISPUTED FACTS

The plaintiff, J.A., was born on September 6, 1997 and was 13 years old at all times relevant to the issues in this action. (Doc. 94, at ¶ 8).

Abington Heights School District is a school district duly organized, established and existing under the laws of the Commonwealth of Pennsylvania with administrative offices located in Lackawanna County, Pennsylvania. Michael Mahon, Ph.D., and Thomas Quinn, Ph.D., were employed as the superintendent and assistant superintendent respectively of AHSD at all times relevant to this matter. Michael Elia and Eduardo Antonetti were employed respectively as the principal and vice-principal of the Abington Heights Middle School at all times relevant to this matter. Brian Kelly was employed as the school counselor of the Abington Heights Middle School at all times relevant to this matter. (Doc. 94, at ¶¶ 2-7).

J.A. has been diagnosed with two neurological disorders: Attention Deficit Disorder ("ADD"), specifically Attention Deficit Hyperactivity Disorder ("ADHD"), and Dysthymia. (*Id.* at ¶ 9). As a result of his diagnosis of ADHD, which is a recognized disability under the Rehabilitation Act of 1973, J.A. was provided an instructional support plan by AHSD

pursuant to Section 504 of the Rehabilitation Act. (*Id.* at ¶ 10). J.A. has never had an IEP. (*See* Dep. of J.A., at 11-12 (stipulation by attorneys for the parties)).

On February 24, 2011, J.A. reported late to school and had to serve detention for late arrival to school. (Doc. 94, at ¶ 12). J.A. admits that on that day he brought a small amount of "spice" to school and that he gave the "spice" to a friend, A.W., in exchange for a debt. (Doc. 97, at ¶¶ 6, 7; *see also*, Dep. of J.A., at 22-23, 95-96). A.W., a non-disabled student, served detention with J.A. on February 24, 2011, and was removed from detention that day by vice-principal Antonetti. (Doc. 94, at ¶ 13). When A.W. briefly returned to detention, he whispered to J.A. that he would tell him later what happened. (Dep. of J.A., at 28-29). Later that day, A.W. told J.A. that a third student, W.F., who is non-disabled, reported A.W. to school administrators for possessing "spice" and providing the "spice" to W.F. As a result, A.W. was searched by school administrators, who found "spice" on him. (Doc. 94, at ¶ 14). Upon discovering the "spice" on A.W., he informed the school administrators that he received it from J.A. (*Id.* at ¶ 15).

J.A. remained in detention until 4:00 p.m. on February 24, 2011, at which time he was permitted to go home. J.A. had no further contact with school administrators that day and J.A.'s mother, K.A., was never contacted by the Defendants, administrators, or teachers regarding J.A.'s possession of "spice". (Doc. 94, at ¶ 16; *see also*, Doc. 97, at ¶ 59). After J.A. finished detention, he contacted A.W., who advised J.A. he was in trouble as a result of

his possession of "spice" and that A.W.'s father was called to the school to meet with administrators that same day. (Doc. 94, at ¶ 17; *see also*, Doc. 97, at ¶ 73).

On February 25, 2011, J.A. arrived to school by bus at 7:45 a.m. and was approached by his counselor, Brian Kelly, who escorted him with his belongings to vice-principal Antonetti's office. (Doc. 94, at ¶ 20). During his deposition, J.A. testified that in Antonetti's office, the vice-principal asked him a few questions and searched his things. (Doc. 97, at ¶ 75; *see also*, Dep. of J.A., at 42). At that time, he was informed that another student had told the District that he had received a substance from J.A. (Doc. 97, at ¶ 76). This initial questioning lasted for ten to fifteen minutes, after which J.A. was moved to the in-school suspension room. (*Id*. at ¶¶ 78, 79). J.A. was given lunch in the in-school suspension room. (*Id*. at ¶ 80). J.A. was then asked questions about other students and people in the community who were drug users. (*Id*. at ¶ 82). According to J.A., Principal Elia dropped in once but did not say anything. (Doc. 97, at ¶ 83; *see also*, Doc. 94, at ¶ 22 (Plaintiff's undisputed statement of fact that Principal Elia was not initially in the room, but later joined in the questioning of J.A. in Antonetti's office regarding his source of the "spice", the cost, and whether he distributed it to any other students)). J.A. testified that Antonetti asked him about abuse and showed concern for him. (Doc. 97, at ¶ 85). J.A. informed Antonetti that his parents had marijuana in the home. (*Id*. at ¶ 86). J.A. was then given another break in the in-school suspension room. (*Id*. at ¶ 87). J.A. was subsequently

interviewed a third time by Elia and Antonetti. During this interview, Antonetti asked the questions, and J.A. was again asked about his home environment. (*Id*. at ¶¶ 88-90).

K.A. stated in her deposition that J.A. did not return home on the school bus as he was supposed to that day, prompting her to call the school at 2:30 p.m. and being told by Antonetti that she needed to come to the school at 3:30 p.m. (Dep. of K.A., at 22; *see also,* Doc. 97, at ¶¶ 60, 61). Upon K.A.'s arrival at school she was informed that her son had been accused of distributing drugs at school. (Doc. 94, at ¶ 27).

J.A. was released to his mother and her fiancé, J.R. and provided a brief explanation of the school's charges against him. (*Id*. at ¶ 28).

By letter dated February 28, 2011, Principal Elia informed K.A. of the reported incident involving J.A. on February 24, 2011, and that her son had been suspended from school for 10 days. (*Id*. at ¶ 29). In a subsequent letter, dated March 3, 2011, Principal Elia summarized a telephone conversation on March 2, 2011, with K.A. regarding the events of February 25, 2011, her declining a meeting at the middle school, and that further notice would be sent by March 11, 2011, if a formal hearing would be scheduled. (*Id*. at ¶ 30). Superintendent Mahon then informed K.A. in a letter dated March 11, 2011, of a formal hearing scheduled for March 14, 2011, regarding charges that J.A. had violated Abington Heights School District Policy No. 227. (*Id*. at ¶ 31). According to the letter, J.A. "[was] charged with possession of drugs on school district property. He [was] charged with providing drugs to another student. He [was] charged with selling drugs to other middle

school students during the 2010-2011 school year.  Jacob [was] also charged with making a

hostile threat of violence in a text message against a fellow student in an effort to cover up

Jacob's drug related activities."  (Letter to K.A. from Michael Mahon, March 11, 2011).

On March 14, 2011, J.A. appeared before the AHSD Board of Directors for an

expulsion hearing. (Doc. 94, at ¶ 32).  J.A., K.A., and J.R., attended the expulsion hearing

without counsel. (*Id*. at ¶ 33).  K.A., Elia, and Antonetti testified at the hearing.  (Doc. 97, at

¶¶ 64, 110, 119).  After hearing the facts and evidence presented during this hearing, the

School Board found J.A. guilty of possession of contraband on school property and

therefore in violation of the school's policies.  (Doc. 94, at ¶ 34).  As a result, the School

Board voted to expel J.A. for the remainder of the 2010-2011 school year and for the

entirety of the 2011-2012 school year with instructions to reapply for the 2012-2013 school

year.  (*Id*. at ¶ 35).

No manifestation determination hearing took place regarding J.A.'s disabilities prior

to his expulsion hearing, except Superintendent Mahon's review of J.A.'s behavior and 504

plan. (*Id*. at ¶ 36).[4]  Mahon acknowledged that in the case of expulsion it must be

considered whether the underlying cause or trigger for the Section 504 plan was the cause

of the behavior that occurred.  (*Id*. at ¶ 38).  Mahon stated that with respect to J.A., he

determined after conferring with the special education director that J.A.'s "ADHD was not

---

[4] Defendants deny this statement of material fact, citing to Mahon's deposition testimony.  (Doc.
101, at ¶ 36).  However, although Mahon testified in his deposition that he was aware that J.A. had a
Section 504 Plan and he therefore reviewed J.A.'s records and spoke with the special education director
prior to J.A.'s expulsion hearing, Mahon did not offer any deposition testimony that J.A. received a *hearing*.
(*See* Dep. of Mahon, at 20-22, 62-63).

manifested in the selling of the drugs . . . and all the things that he had been accused of."
(*Id*. at ¶ 37).

The record reflects that by letter to Mahon dated November 29, 2011, Plaintiff's legal counsel, attorney Harry P. McGrath, requested "a special educational due process hearing under the Individual with Disabilities Education Act, Section 504 of the Rehabilitation Act of Chapters 14 and 15 of the Pennsylvania School Code."  (Letter from Attorney McGrath to Dr. Mahon, Nov. 29, 2011).  A hearing was thereafter held on March 1, 2012, before Special Education Hearing Officer Anne L. Carroll, Esq.  On March 31, 2012, the Hearing Officer issued a Decision wherein she summarized J.A. and K.A.'s due process complaint as follows:

> Parent filed a due process complaint in November 2011 alleging violations of § 504 and IDEA due to the District's failure to conduct a full psycho-educational evaluation, provide adequate and appropriate services to assure that Student received a free, appropriate public education (FAPE) and to properly consider Student's disability before imposing a disciplinary change of placement.

(Pennsylvania Special Education Hearing Officer Decision, March 31, 2012, at 2).  The Hearing Officer's Decision found that the District engaged in "a myriad of procedural and substantive violations" of Plaintiff's rights.  (*Id*.).  Of note, the parties agree that the Defendant's failure to conduct a manifestation hearing and/or Section 504 hearing was fully adjudicated during the initial due process hearing before the Pennsylvania Special Education Hearing Officer. (Doc. 94, at ¶ 41; Doc. 101, at ¶ 41).

The District appealed the Hearing Officer's decision to the Middle District of Pennsylvania.  (*See generally*, 3:12-cv-804-RDM (M.D. Pa. 2012)).  On August 15, 2012,

the parties executed a Release and Settlement Agreement, thereby settling the District's

appeal and closing the federal action.

The Release and Settlement Agreement provides:

Releasors acknowledge and agree that by accepting the terms of this Agreement that they are waiving rights, release, and forever discharge on their own behalf, and on behalf of the Student, Releasee, and its present and past officers, directors, professional staff employees, agents, attorneys, and insurers from any claim or demand of any kind, administrative or judicial, concerning the education of the Student (from the beginning of time until the effective date of this Agreement) whether or not known, including but not limited to claims for compensatory education, denial of a Free Appropriate Public Education, extended school year, related services, assistive technology, tuition reimbursement, transportation, attorney fees and costs, any and all expert witness fees and costs, evaluations of any kind, whether associated with a due process hearing request, federal lawsuit or litigation or otherwise, any other costs, charges, or liabilities, including claims for compensatory damages, including but not limited to claims pursuant to the IDEA and its implementing regulation, 34 C.F.R. Part 300 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, ("Section 504") and its implementing regulation, 34 C.F.R. Part 104; the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12101-12213 ("ADA"); The Pennsylvania School Code of 1949, 24 P.S. 1-101, *et seq*.; Chapters 14, 15 and 16 of the regulations of the State Board of Education, 22 Pa. Code Chapters. 14, 15, and 16; former Chapter 342 of the standards of the Pennsylvania Department of Education, former 22 Pa. Code Chapter 342; or any other applicable state or federal law for any claim that may arise or has arisen regarding Student's educational programming and/or placement from the beginning of time until the effective date of this Agreement.

(Release and Settlement Agreement, at ¶ 17).

Furthermore, the Agreement recognizes that

the Releasee's agreement to pay the amount stated is intended to provide Releasors with consideration for a settlement and compromise of all claims regarding the Student's educational programming and/or placement, that they may not have or which may in the future arise relative to the above disputes

through the date of the Releasors' execution of this release and settlement agreement, including claims for compensatory education or compensatory damages that they and/or the Student may otherwise have arising under the IDEA, Section 504 of the Rehabilitation Act, or the ADA.

(*Id.*).

However, the Agreement specifically

does not settle claims that are non-educational in nature which may arise from the investigation which took place on February 24 and 25, 2011, including a claim pursuant to Section 504 of the Rehabilitation Act or 42 U.S.C. Sections 12101-12213 ("ADA") based upon the investigation of February 24 and 25, 2011, but does settle all claims under Section 504 of the Rehabilitation Act and 42 U.S.C. Sections 12101-12213 ("ADA") based upon, related to, or arising out of the Student's 504 plans, educational programming, and/or educational placement.

(*Id.*).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe

it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

In this case, the parties have filed cross-motions for summary judgment.  According to the Third Circuit:

Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir. 2008).  Each movant must show that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the Court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008).  When reviewing each cross-motion, the Court is still bound to view the evidence in the light most favorable to the non-movant. Fed. R. Civ. P. 56; *United States v. Hall*, 730 F.Supp. 646, 648 (M.D. Pa. 1990).

## IV. ANALYSIS

### A. Count I – Violations of the Fourteenth Amendment

Defendants assert that they are entitled to summary judgment on Plaintiff's procedural due process claim (Count I) against AHSD and Mahon, Elia, Antonetti, and Kelly in their individual capacities.  (Doc. 96, at ¶¶ 14-39).  Because Plaintiff "does not contest the Defendants' request for summary judgment relative to Count I of the Plaintiff's Second

Amended Complaint" (Doc. 103, at 2), the Court will enter summary judgment in favor of the defendants and against the plaintiff on Count I without further discussion.

### B. Count IV – Violation of Section 504 of the Federal Rehabilitation Act

Plaintiff and AHSD both move for summary judgment with respect to Count IV of the Second Amended Complaint, "Violation of Section 504 of the Federal Rehabilitation Act." Defendant argues that Plaintiff has failed to present evidence to establish a Section 504 claim and that Plaintiff cannot recover compensatory damages pursuant to Section 504 because there is no evidence of intentional conduct.  (Doc. 96, at ¶¶ 46-49).  Defendant further contends that Plaintiff cannot prevail on his Section 504 claim because it is based upon issues which were previously decided by the special education hearing officer and were released in the Release and Settlement Agreement.  (*Id*. at ¶¶ 40-45).  In contrast, Plaintiff asserts that he is entitled to summary judgment on the basis that the record evidence establishes that he was not provided with a pre-expulsion hearing, a manifestation determination hearing, or hearing similar to a manifestation determination hearing as necessary under Section 504.  (Doc. 93).[5]

---

[5] Plaintiff also argues that he is entitled to summary judgment because he has exhausted his administrative remedies regarding AHSD's failure to provide him with a manifestation hearing and/or Section 504 hearing.  (Doc. 95, at 15-16).  Defendants do not dispute this assertion, and the Court deems Plaintiff's assertion as undisputed and need not address this issue further.  *See also, Vicky M. v. Northeastern Educ. Intermediate Unit*, 689 F.Supp.2d 721, 736 (M.D. Pa. 2009) (citing *A.W. v. New Jersey Pub. Sch*., 486 F.3d 791 (3d Cir. 2007); *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272 (3d Cir. 1996)) ("Claims pursuant to the Rehabilitation Act (Section 504) have a private right of action through Title VI of the Civil Rights Act, and do not require exhaustion.").

**1. Whether a Material Factual Dispute Exists as to Plaintiff's Section 504 Claim.**

Section 504 provides in relevant part:

No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . .

29 U.S.C. § 794(a). To establish a violation of Section 504, a plaintiff must show that "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation,* 490 F.3d 337, 350 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 253 (3d Cir.1999), *superseded by statute on other grounds as recognized by D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488 (3d Cir. 2012)).

Additionally, "[t]he state must have failed to provide the service for the sole reason that the child is disabled." *Andrew M.*, 490 F.3d at 350. In other words, a "plaintiff cannot establish a Rehabilitation Act claim simply by demonstrating a disability and denial of some service. Instead, the plaintiff must show that the service was not provided solely because the plaintiff is disabled." *D.G. v. Somerset Hills Sch. Dist.*, 559 F.Supp.2d 484, 497 (D.N.J. 2008) (citing *Andrew M.*, 490 F.3d at 350).

AHSD does not dispute that Plaintiff can establish the first three elements to succeed on his Section 504 claim, namely, that J.A. was disabled as defined by the Act due to his

ADD/ADHD, that he was qualified to participate in school activities, and that Abington Heights receives federal financial assistance. (*See generally,* Doc. 98, at 22-23).  Nor does AHSD assert that Plaintiff was not excluded from participation in, or denied the benefits of, the school.  Rather, Defendant's motion for summary judgment on this issue only contends that "Plaintiff has failed to present any evidence to establish that Plaintiff was treated differently because of his disability, or that the decision to expel him was due to his disability."  (Doc. 98, at 23).

 "[A] plaintiff need not establish that there has been an intent to discriminate in order to prevail under § 504."  *Nathanson v. Med. Coll. of Pennsylvania*, 926 F.2d 1368, 1384 (3d Cir. 1991).  Thus, Plaintiff did not have to present evidence demonstrating an intent on the part of AHSD to discriminate against J.A., but simply evidence that Defendant's actions or inactions resulted in the exclusion of J.A. from participation in, the denial of benefits of, or that he was subjected to discrimination at, school, due to his disability.

The regulations regarding the implementation of Section 504 in the context of educational institutions appear at 34 C.F.R. Part 104.[6]  Although the Rehabilitation Act does not provide any express procedural protections that must be afforded to a student who is disabled under Section 504, the regulations implementing Section 504 dictate that the student be afforded certain due process protections.  Pursuant to 34 C.F.R. § 104.36:

---

[6] *See* 34 C.F.R. § 104.1 ("The purpose of [34 C.F.R. § 104, *et seq.*] is to effectuate section 504 of the Rehabilitation Act of 1973, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving Federal financial assistance.").

A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure. Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act [now "IDEA"] is one means of meeting this requirement.

34 C.F.R. § 104.36. Thus, although one method of satisfying the requisite due process requirements is a manifestation hearing, at minimum, a school must provide, in some form, the student with "notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure." *See id.*

Here, the undisputed sequence of events leading to J.A.'s expulsion is as follows:

On February 24, 2011, J.A. brought a small amount of "spice" to school and gave the "spice" to a friend, A.W., in exchange for a debt. (Doc. 97, at ¶¶ 6, 7; *see also*, Dep. of J.A., at 22-23, 95-96). J.A. admits that he sent a text message to A.W. on February 24, 2011, stating "Holy shit, who is the WF, I am going to beat the shit out of him. Snitches die." (Dep. of J.A., at 102; *see also*, Affidavit of Probable Cause, at 4).

On February 25, 2011, J.A. arrived to school by bus at 7:45 a.m. and was approached by his counselor, Brian Kelly, who escorted him with his belongings to vice-principal Antonetti's office. (Doc. 94, at ¶ 20). J.A. remained in the in-school suspension area until the end of the day, at which time he was escorted out and his parents were

waiting outside the room in the office. (Doc. 94, ¶ 25; Doc. 97, ¶ 91). When J.A. was released to his mother and her fiancé, they were provided a brief explanation of the school's charges against J.A. (Doc. 94, at ¶ 28).

By letter dated, February 28, 2011, Principal Elia informed K.A. of the reported incident involving J.A. on February 24, 2011, and that her son had been suspended from school for 10 days. (*Id*. at ¶ 29). In a subsequent letter, dated March 3, 2011, Principal Elia summarized a telephone conversation he had with K.A. on March 2, 2011, regarding the events of February 25, 2011, her declining a meeting at the middle school, and that further notice would be sent by March 11, 2011 if a formal hearing would be scheduled. (*Id*. at ¶ 30). Superintendent Mahon then informed K.A. in a letter dated March 11, 2011, of a formal hearing scheduled for March 14, 2011, regarding charges that J.A. had violated Abington Heights School District Policy No. 227. (*Id*. at ¶ 31).

On March 14, 2011, J.A. appeared before the AHSD Board of Directors for an expulsion hearing. (*Id*. at ¶ 32). After hearing the facts and evidence presented during this hearing, the School Board found J.A. guilty of possession of contraband on school property and therefore in violation of the school's policies. (*Id*. at ¶ 34). As a result, the School Board voted to expel J.A. (*Id*. at ¶ 35).

Although Mahon testified in his deposition that he consulted with the director of special education, reviewed J.A.'s records, and thereafter determined that J.A.'s actions were not the result of his disability (Dep. of Mahon, at 58-63), this is insufficient to comply

with the statutory protections afforded to a Section 504 student. Mahon's unilateral determination deprived J.A. and his parents of notice and of the opportunity to review any relevant records and to appear at, and participate in, an impartial hearing and set forth their position on this matter.

Thus, the aforementioned sequence of events demonstrates that at no time prior to J.A.'s expulsion were J.A. and K.A. given the opportunity to investigate, or provide evidence either formally or informally, that J.A.'s actions may have been the result of his recognized Section 504 disability. J.A. was therefore deprived of the procedural safeguards mandated by the Section 504 applicable regulations.

However, despite finding that J.A. was deprived of his right to a pre-expulsion hearing, Plaintiff is not entitled to summary judgment on Count IV due to several existing disputes of material fact. Although it is undisputed that A.W.'s father and W.F's mother were called on February 24, 2011, the same afternoon that Elia and Antonetti spoke to A.W. and W.F., whereas J.A. was detained for the entire school day on February 25, 2011, before K.A., upon calling the school, was notified that she needed to come to the school, this alone is insufficient to establish that J.A. was deprived of one of more services at the school *solely* due to his disability. A factual dispute exists as to the reasons for Elia and/or Antonetti's failure to call K.A. Further, no party has submitted evidence of what specific disciplinary actions were taken as a result of A.W. and W.F.'s actions on February 24, 2011, and therefore the Court is unable to ascertain whether the discipline received by A.W. and W.F.

demonstrates that J.A. was treated differently than the non-disabled students, and specifically whether any different treatment was due to his disability. Rather, according to Antonetti, he "believed" that A.W. and W.F. faced discipline. (Dep. of Antonetti, at 42). Elia testified that A.W. "was suspended for three days and he was invited to come back and have a follow-up meeting with me [a]nd then he was suspended for ten days based on the information and he also went to an expulsion hearing." (Dep. of Elia, at 28). Elia further stated that J.A. was not treated any differently than A.W. with regard to the letters sent to the parents and the expulsion proceedings, that he sent a similar letter to A.W.'s parents as the one he sent to K.A., and that it is "always [his] procedure" to offer the student at issue and his/her parents the opportunity to come in and meet with him. (See Dep. of Elia, at 28-29). Thus, there is no record evidence removing the disputes of fact as to what discipline W.F. faced or whether A.W. and/or W.F. were expelled as a result of their participation in the events of February 24, 2011.

As a consequence, neither party is entitled to summary judgment on the issue of whether J.A.'s rights under Section 504 were violated.

Nonetheless, even if the Court found that Plaintiff was entitled to summary judgment as a result of AHSD's violation of Plaintiff's Section 504 due process rights, a separate and dispositive question remains as to whether J.A. is entitled to compensatory damages for this violation. The Third Circuit has emphasized that its holding that "'a plaintiff need not prove that defendants' discrimination was intentional', refer[s] only to *liability,* and not damages; it

was intended to address the requirements for showing a *violation* of § 504, not the requirements for particular remedies." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013) (emphasis in original). Therefore, even if this Court found that Plaintiff's Section 504 rights were violated, Plaintiff is not entitled to compensatory damages absent a showing of intentional discrimination.

The Third Circuit has found that the deliberate indifference standard provides the proper test when evaluating whether a defendant has engaged in intentional discrimination. *Id*. at 262-263. Thus, to establish intentional discrimination, "a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the [Rehabilitation Act]." *Id*. at 263. Although deliberate indifference "does not require a showing of personal ill will or animosity toward the disabled person," deliberate indifference must be a deliberate choice "rather than negligence or bureaucratic inaction." *Id*. Thus, to establish that AHSD was deliberately indifferent, Plaintiff must present evidence showing "(1) *knowledge* that a federally protected right is substantially likely to be violated . . . and (2) *failure to act* despite that knowledge." *Id*. at 265 (emphasis in original).

The first prong of the deliberate indifference analysis requires a showing of actual knowledge; "allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." *Id*. at 266 n. 26. Here, Plaintiff has failed to present any evidence that AHSD *knew* that it was violating J.A.'s federally protected right

when it failed to provide him with notice and a hearing to determine the role his disability may have played in his violations of school policy.

According to Mahon, "if a student is recommended to be expelled, it would be at that point regardless of a disability that the matter would be reported and referred to [him]." (Dep. of Mahon, at 34; *see also, id.* at 33). Mahon explained that "students with an IEP [ ] would have a manifestation hearing if [the school] was recommending an expulsion beyond a ten-day suspension" but that he did "not believe that a manifestation hearing is required for a student who does not have an IEP." (*Id*. at 14). Instead, Mahon explained that the procedural safeguards afforded to students with a Section 504 plan were as follows:

> Any time a student with a 504 is recommended for an expulsion, which would be an exclusion from school or change in placement beyond ten days, the record is reviewed to determine if the underlying behavior that is causing concern is a result of the student's disability or identified with respect to the 504 plan.

(*Id*.). Later in his deposition, Mahon reiterated his understanding that students with an IEP were entitled to manifestation hearing, and explained that the hearing would generally be held by the special education director who would then report to Mahon, but that "for a case of 504 [Mahon] would confer with the special ed. director." (*Id*. at 60).

With respect to J.A.'s case, Mahon "conferred with the director of special education and reviewed the records and determined that the ADHD was not manifested in the behavior." (*Id*. at 60, 63; *see also, id.* at 58 (stating that he "was involved in discussions with [the] director of special education because [Mahon] recognized prior to having a –

scheduling a board hearing that the student had a 504 plan because of his ADHD[, s]o [Mahon] met with [the] director of special education and discussed the case with respect to the allegations made against [J.A.] and his 504 plan.")). As Mahon explained, it was his understanding that in the case of expulsion, the student's disability must be considered in determining whether "the underlying cause or trigger for the 504 was the result or cause of behavior" that occurred. (*Id*. at 62). Mahon also testified that he could not remember any other Section 504 student being in a similar situation as J.A. and that expulsions are exceedingly rare. (*See id*. at 58-61).

Any argument that Mahon, the decision-maker, *should have known* that J.A. was entitled to an additional hearing prior to being expelled is insufficient to show deliberate indifference. Mahon and AHSD were not on notice that they were, or were substantially likely to, violate a federally protected right, by not affording J.A. a pre-expulsion hearing due to his recognized Section 504 disability. There is no evidence that the School District had ever been confronted with a similar situation or was ever informed that they must afford a student with a Section 504 disability additional notice and opportunity to be heard. Further, Mahon's testimony that he reviewed J.A.'s records with the special education director and made a determination that J.A.'s disability was not a factor in his violations of school policy demonstrates that Mahon knew that J.A.'s disability should be taken into account when deciding whether he should be recommended for expulsion; Mahon simply was unaware of

the correct procedure for doing so when presented with a student who only had a Section 504 plan and not an IEP or other special education designation.

Because Plaintiff has failed to show a genuine dispute of material fact with respect to AHSD's lack of knowledge that a federally protected right was substantially likely to be violated, the Court will not address the second prong of a deliberate indifference analysis, i.e. that AHSD failed to act despite that knowledge.

For the aforementioned reasons, even if no material factual disputes existed as to whether AHSD violated Plaintiff's Section 504 due process rights, Plaintiff is not entitled to compensatory damages for this violation.

## 2. The Release and Settlement Agreement

Despite having found that Plaintiff may not recover damages for any violation of Section 504 on the part of AHSD, the Court will also address the issue of whether the terms of the Release and Settlement Agreement, signed by the AHSD Board President and K.A., to settle a prior lawsuit, bars Plaintiff's present Section 504 claim.

On August 15, 2012, AHSD and K.A., individually and as Parent, natural guardian and legal guardian of Jacob Anderson, executed a Release and Settlement Agreement, settling the District's appeal of the Hearing Officer's decision and closing the federal action.

The Release and Settlement Agreement provides:

Releasors acknowledge and agree that by accepting the terms of this Agreement that they are waiving rights, release, and forever discharge on their own behalf, and on behalf of the Student, Releasee, and its present and past officers, directors, professional staff employees, agents, attorneys, and

insurers from any claim or demand of any kind, administrative or judicial, concerning the education of the Student (from the beginning of time until the effective date of this Agreement) whether or not known, including but not limited to claims for compensatory education, denial of a Free Appropriate Public Education, extended school year, related services, assistive technology, tuition reimbursement, transportation, attorney fees and costs, any and all expert witness fees and costs, evaluations of any kind, whether associated with a due process hearing request, federal lawsuit or litigation or otherwise, any other costs, charges, or liabilities, including claims for compensatory damages, including but not limited to claims pursuant to the IDEA and its implementing regulation, 34 C.F.R. Part 300 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, ("Section 504") and its implementing regulation, 34 C.F.R. Part 104; the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12101-12213 ("ADA"); The Pennsylvania School Code of 1949, 24 P.S. 1-101, *et seq*.; Chapters 14, 15 and 16 of the regulations of the State Board of Education, 22 Pa. Code Chapters. 14, 15, and 16; former Chapter 342 of the standards of the Pennsylvania Department of Education, former 22 Pa. Code Chapter 342; or any other applicable state or federal law for any claim that may arise or has arisen regarding Student's educational programming and/or placement from the beginning of time until the effective date of this Agreement.

(Release and Settlement Agreement, at ¶ 17).

Furthermore, the Agreement recognizes that

the Releasee's agreement to pay the amount stated is intended to provide Releasors with consideration for a settlement and compromise of all claims regarding the Student's educational programming and/or placement, that they may not have or which may in the future arise relative to the above disputes through the date of the Releasors' execution of this release and settlement agreement, including claims for compensatory education or compensatory damages that they and/or the Student may otherwise have arising under the IDEA, Section 504 of the Rehabilitation Act, or the ADA.

(*Id*.).

However, the Agreement specifically

does not settle claims that are non-educational in nature which may arise from the investigation which took place on February 24 and 25, 2011, including a claim pursuant to Section 504 of the Rehabilitation Act or 42 U.S.C. Sections 12101-12213 ("ADA") based upon the investigation of February 24 and 25, 2011, but does settle all claims under Section 504 of the Rehabilitation Act and 42 U.S.C. Sections 12101-12213 ("ADA") based upon, related to, or arising out of the Student's 504 plans, educational programming, and/or educational placement.

(*Id*.).

Plaintiff asserts that the language of the Release and Settlement Agreement "ferrets out the Plaintiff's Section 504 claim as asserted in Count IV for failure to provide the requisite procedural safeguards as mandated by the Rehabilitation Act." (Doc. 103, at 9). Indeed, a review of Plaintiff's Second Amended Complaint makes clear that his present claim for a violation of Section 504 arises from the purported deprivation of his right to an additional hearing, and notice of that hearing, prior to the expulsion hearing.

Here, the settlement agreement makes clear that the releasors are "waiving rights, release, and forever discharge on their own behalf, and on behalf of the Student":

*any claim* or demand of any kind, administrative or judicial, concerning the education of the Student (from the beginning of time until the effective date of this Agreement) whether or not known, including but not limited to claims for compensatory education, denial of a Free Appropriate Public Education, extended school year, related services, . . . any other costs, charges, or liabilities, including claims for compensatory damages, *including but not limited to* claims pursuant to the IDEA and its implementing regulation, 34 C.F.R. Part 300 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, ("Section 504") and its implementing regulation, 34 C.F.R. Part 104; . . . or any other applicable state or federal law *for any claim that may arise or has arisen regarding Student's educational programming and/or placement* from the beginning of time until the effective date of this Agreement.

(Release and Settlement Agreement, at ¶ 17) (emphasis added).  The settlement agreement states that it "does settle all claims under Section 504 of the Rehabilitation Act and 42 U.S.C. Sections 12101-12213 ('ADA') based upon, related to, or arising out of the Student's 504 plans, educational programming, and/or educational placement."  (*Id*.). The agreement only specifically "does not settle claims that are non-educational in nature which may arise from the investigation which took place on February 24 and 25, 2011." (*Id*.).

Despite Plaintiff's assertions to the contrary, the procedural safeguards that Plaintiff asserts form the basis for his Section 504 claim are educational in nature.  The procedural safeguards to which Plaintiff was entitled are in place to ensure that a Section 504 student is not expelled due to a problem that was a manifestation of his or her Section 504 disability. The expulsion itself results in a change in the Student's educational programing and placement.  Plaintiff's claims regarding the absence of an additional hearing, and the resulting expulsion, are all predicated on the deprivation of educational rights and benefits derived from Section 504, and 34 C.F.R. § 104.36 in particular, which provides for additional safeguards for "*actions regarding the identification, evaluation, or educational placement of persons.*"  Consequently, Plaintiff's expulsion hearing, and the absence of any requisite additional procedural safeguards to which he may have been entitled as a disabled student, are educational in nature and do not directly relate to his treatment by Defendants on February 24 and 25, 2011.

Although Plaintiff's current Section 504 claim is tangentially related to the events of February 24-25, 2011, in that the actions of the plaintiff and defendants formed the basis for the expulsion hearing, this claim is separate and distinct from a claim of a Section 504 violation as a result of the February 24-25 investigation, and the actions, and inactions, of the defendants on those two days. Plaintiff is not attempting to assert a Section 504 claim premised, for example, on an argument that his prolonged detention on February 25, 2011, excluded him from participation in, or denied him the benefit of, attending his classes, and that this detention was by reason of his disability as opposed to those reasons asserted by the defendants.[7] Such a claim may possibly fall into the category of claims not released by the settlement agreement; i.e. a claim that is "non-educational in nature which may arise from the investigation which took place on February 24 and 25, 2011." The Section 504 claims not settled by the agreement relate to those that arose as a result of the investigation of February 24 and 25, 2011, which this Court finds are separate from Plaintiff's 504 claim that arises as a result of the lack of an additional hearing to determine whether JA's disability was a factor in his admitted violations of the school policy, prior to the expulsion hearing.[8]

---

[7] The Court does not express an opinion with respect to whether such a claim would be viable, but merely uses this example to distinguish between those claims which are, and are not, barred by the Agreement.

[8] Even if this Court were to accept that Plaintiff's deprivation of a pre-expulsion hearing does not constitute a claim arising from or related to J.A.'s Section 504 plan, educational programming, and/or educational placement, and was non-educational in nature, Plaintiff's Section 504 claim still does not relate to claims that were not released, i.e. claims of a "non-educational" nature arising from the investigation that occurred on February 24 and 25, 2011. Rather, the Court reads the Agreement as allowing Plaintiff to

Finally, Plaintiff contends that this Court should find that even if the parties intended that the plaintiff's current Section 504 claim would be barred by the Release, because the Release was signed by K.A., "the minor's claims are not affected" because "'under Pennsylvania law, parents do not possess the authority to release claims or potential claims of a minor merely because of the parental relationship.'" (Doc. 103, at 10) (quoting *Apicella v. Valley Forge Military Acad. and Junior Coll.*, 630 F.Supp.20, 24 (E.D. Pa. 1985)).

Although K.A. arguably would not have the authority to waive any of J.A.'s claims that were of a non-educational nature, here, the statutory language and case law explained, *infra*, clearly permit a minor's parent or guardian to enter into a settlement or release of the minor's educational claims. Indeed, to hold otherwise would deter a school district from entering into any settlement or release with a parent or guardian with respect to a child's educational rights, without court approval, out of a concern that upon reaching the age of majority, the young adult would bring an action for the very same claims that were previously released.

In the present action, Plaintiff's Section 504 claim is premised on a denial of J.A.'s right to an additional hearing, as prescribed in 34 C.F.R. 104.36. The parties do not dispute that the defendant's failure to conduct a manifestation hearing and/or Section 504 hearing was fully adjudicated during the initial due process hearing before the Pennsylvania Special Education Hearing Officer. (Doc. 94, at ¶ 41; Doc. 101, at ¶ 41). The defendants appealed

bring non-educational claims relating to J.A.'s treatment on the days in question, his subsequent proceedings before Juvenile Court for the County of Lackawanna, Commonwealth of Pennsylvania and any resulting physical or mental damages.

the Hearing Officer's decision, which in part found that the "Student clearly did not receive the due process protections that should have been provided before the discipline was imposed" (Special Education Hearing Officer Decision, at 24).

"A parent can waive her child's right to a [Free Appropriate Public Education]." *Ballard ex rel. Ballard v. Philadelphia Sch. Dist.*, 273 F.App'x 184, 188 (3d Cir. 2008). According to 34 C.F.R. 104.33, a free and appropriate education under Section 504 consists of "regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped **persons** as adequately as the needs of non **handicapped persons** are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36", without cost to the handicapped person or to his parents or guardians. 34 C.F.R. 104.33(b)(1); 34 C.F.R. 104.33(c)(1). Thus, the protections of § 104.36 are encompassed within the right to a FAPE.

Furthermore , the Third Circuit has noted that "there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and . . . that the regulations implementing § 504 require that school districts 'provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'" *Ridgewood*, 172 F.3d at 253 (citing *W.B. v. Matula,* 67 F.3d 484, 492-493 (3d Cir. 1995)). Therefore, persuasively underlying this Court's finding that J.A.'s rights were relinquished by the Release and Settlement Agreement, is the procedural safeguard provided for under IDEA, which allows that in a case wherein a resolution is reached to resolve a complaint relating to the

identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child, through the mediation process or through a preliminary meeting prior to a due process hearing, "the parties shall execute a legally binding agreement" that, among other things, "is signed by both the parent and a representative of the agency who has the authority to bind such agency" and is "enforceable in any State court of competent jurisdiction or in a district court of the United States." *See* 20 U.S.C. § 1415(e)(F); 20 U.S.C. § 1415(f)(1)(B)(iii); *see also*, 20 U.S.C. § 1415(b)(6)(A).

For the aforementioned reasons, the Release and Settlement Agreement entered into by AHSD and K.A. bars Plaintiff's present Section 504 claim for a manifestation hearing, Section 504 hearing, and all other claims under Section 504 based upon, related to, or arising out of J.A.'s 504 plans, educational programming, and/or educational placement.

### C. Count II – Breach of Fiduciary Duty

Defendants argue that they are entitled to summary judgment on Plaintiff's Breach of Fiduciary claim (Count II) against Elia, Antonetti, and Kelly, because (1) Plaintiff has failed to produce any evidence to support a claim for breach of fiduciary duty, and (2) Plaintiff has failed to produce any evidence of actual malice or willful misconduct such that the defendants are entitled to immunity under the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 *et seq*. ("PSTCA"). (Doc. 96, at ¶¶ 7-13). The Court will address these arguments in turn.

**1. Whether a Material Factual Dispute Exists as to Plaintiff's Breach of Fiduciary Duty Claim.**

Preliminarily, the Court finds it necessary to establish what allegations form the basis for Plaintiff's claim of breach of fiduciary duty. While Defendants broadly assert that they are entitled to summary judgment on Count II, it is unclear that they understand the factual bases for Plaintiff's claim: Defendants' brief in support of their motion with respect to Count II fails to identify any material facts specifically related to this count that support their position that they did not breach a fiduciary duty. In contrast, Plaintiff's brief in opposition to Defendants' motion appears to assert that the breach of fiduciary duty is premised on J.A.'s "depend[ence] upon the Defendants to provide him a proper and safe education and to utilize sound judgment in handling his infraction and disciplinary process [and] to provide him with all necessary safeguards available to students with a disability." (Doc. 103, at 4). Specifically, Plaintiff points to the defendants' "fail[ure] to handle J.A.'s infraction in the same manner they handled the infractions of other students", "fail[ure] to contact the police in a timely manner [or] Lackawanna County Children and Youth" and the defendants' detention of J.A. "for a period of seven and one-half hours on February 25, 2011." (*Id*.). Plaintiff further asserts that "the Defendants failed to exercise sound judgment and failed to provide J.A. with the required protections available under Section 504 of the Rehabilitation Act." (*Id*.).

A review of Plaintiff's Second Amended Complaint reveals that the basis underlying the breach of fiduciary duty claim now set forth by Plaintiff in his brief in opposition to

Defendants' motion for summary judgment is far broader than that pleaded in the controlling

Complaint. The Second Amended Complaint specifically alleges the following:

> . . . Elia, Antonetti and Kelly in their fiduciary capacity owed a duty to J.A. and failed in that duty by:
>
> 1. Failing to call the proper authorities on Thursday, February 24, 2011, when they knew or should have known that calling:
>     (a) the police;
>     (b) Children & Youth of Lackawanna County;
>     (c) another social service provider[;]
> was in the student's best interest but instead allowed the student to return to the home, where those same Defendants now argue was unsafe, and
>
> 2. Failing to call these same agencies on February 25, 2011 and instead detained the student for 7 ½ hours, and
>
> 3. Failing to allow the proper law enforcement authorities to conduct the investigation and by conducting the same themselves, did so without any consideration for the effect said investigation have on J.A.'s relationship with his parents and his public school.

(Doc. 47, at ¶ 162).[9]

As a result of Plaintiff's well-pleaded allegations, the Court considers Plaintiff's

breach of fiduciary duty to be premised on the actions, or inactions, of the individual

defendants on February 24 and 25, 2011. Plaintiff did not plead a breach of fiduciary duty

for any of the defendants' conduct after February 25, 2011, including a breach of this duty

by failing to provide J.A. with an additional pre-expulsion hearing as dictated under Section

---

[9] Count II of Plaintiff's Second Amended Complaint also broadly states in a somewhat confusing and circular manner that "Defendants breached their fiduciary duty to minor plaintiff J.A. by denying him his right to liberty, equal protection, due process, and by breaching their fiduciary duty which J.A. was due." (Doc. 47, at ¶ 166). The Court interprets the allegations of a denial of "liberty, equal protection, [and] due process" in this Count to apply only to the specific factual allegations stated above.

504.[10]  In determining whether there is a material factual dispute with respect to whether

Elia, Antonetti, and/or Kelly breached their fiduciary duty to J.A., the Court will therefore limit

its analysis to the conduct of the defendants on February 24 and 25 of 2011.

A fiduciary relationship exists between two individuals when one of the persons "is

under a duty to act for or to give advice for the benefit of another [person] upon matters

within the scope" of that relationship.  Restatement (Second) of Torts, § 874 cmt. a (1979).

As the Pennsylvania Supreme Court explained, the "essence of such a relationship is trust

and reliance on one side, and a corresponding opportunity to abuse that trust for personal

gain on the other."  *In re Scott's Estate*, 316 A.2d 883, 885 (Pa. 1974).  In an action for a

breach of fiduciary duty in an educational setting, a fiduciary duty has been found to be

created by "[t]he basic duties which arise from the teacher-student relationship . . .

[including] a duty to supervise, a duty to exercise good judgment, and a duty to instruct as to

correct procedures, particularly, not but [*sic*] exclusively, when potentially hazardous

conditions or instrumentalities are present, and these basic duties must co-exist with the

whole purpose for the teacher-student relationship."  *Vicky M. v. Northeastern Educ.*

*Intermediate Unit 19*, 486 F.Supp.2d 437, 458 (M.D. Pa. 2007).   Additionally, "in order to

breach a fiduciary duty, the dominant party must act for his or her own personal gain or to

his or her own advantage."  *Manning v. Temple Univ.*, 2004 WL 3019230, at *10 (E.D. Pa.

2004), *aff'd*, 157 F.App'x 509 (3d Cir. 2005).  *See also*, Pa. S.S.J.I. (Civ.) § 6.210 (2016)

_____

[10] Even if the Court were to find that Plaintiff's breach of fiduciary duty claim was premised on any violations of Plaintiff's Section 504 rights that occurred after February 25, 2011, the actions leading to those purported violations were taken by Mahon, who was previously dismissed from this Count.

(stating that a person who owes a fiduciary duty to another violates that duty when he has a personal interest in the dealings that might affect his judgment or fails to act only for the benefit of the other person). To establish a breach of a fiduciary duty, the plaintiff must establish: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of the plaintiff in all matters for which he was employed, or negligently or intentionally failed to use reasonable care in carrying out his duties; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit, or to use the skill and knowledge demanded of him by law, was a real factor in bringing about the plaintiff's injuries. Pa. S.S.J.I. (Civ.) § 6.210 (2016).

For purposes of Defendants' motion for summary judgment, and viewing all evidence in favor of the non-moving party, the Court will assume that a fiduciary duty existed between J.A. and Defendants Antonetti, Elia, and Kelly. Defendants' brief in support of their motion does not address the presence, or lack thereof, of a fiduciary duty, and the Court interprets Defendants' lack of argument on this issue as a concession, at least for purposes of summary judgment, that Elia, Antonetti, and Kelly each owed J.A. a fiduciary duty. Thus, the only issue is whether one or more of these Defendants breached that duty.

With respect to Plaintiff's allegations that the individual defendants breached their fiduciary duty by failing to call the proper authorities on February 24 and/or February 25, 2011, this assertion is clearly contradicted by the record evidence. According to the Affidavit of Probable Cause, submitted on February 25, 2011, by Detective Thomas Davis in

support of his Application for a Search Warrant for the home of K.A. and J.A., on February 24, 2011, "Detectives from the Lackawanna County District Attorney's Office were requested by Chief Robert Reese to respond to the Abington Heights Middle School to assist in a drug investigation." (Affidavit of Probable Cause, Feb. 25, 2011, at 3; *see also*, second Affidavit of Probable Cause, at 10). Detective Davis' Affidavit of Probable Cause in support of the charges filed against K.A. and her fiancé, further states that on February 25, 2011, Detective Thomas "received a telephone call from Eduardo Antonetti, Vice Principal of Abington Heights Middle School [who] stated he and Principal Elia had escorted [J.A.] into the office and interviewed him regarding the events that took place the previous day." (Affidavit of Probable Cause, at 11). Further, Antonetti stated during his deposition that following his initial conversation with J.A., Antonetti left the middle school and went to the high school where he met with several individuals, including police officers. (Dep. of Antonetti, at 26-27).[11] Plaintiff has provided no evidence to place any of Detective Thomas' sworn statements in his Affidavits or Antonetti's testimony in doubt.[12] Thus, because the evidence demonstrates that the police were called on February 24, 2011, and February 25,

---

[11] With respect to whether Children and Youth Services were ever called, Antonetti stated at his deposition that he "believed" he contacted Children and Youth Services, but that nothing occurred as a result of that contact, "as is often the case with them" (Dep. of Antonetti, at 33). It is unclear whether this alleged phone call occurred on February 24 or 25, 2011. Neither Defendants nor Plaintiff address the issue of the involvement, or lack thereof, of Children and Youth Services in their respective briefs or statements of material facts and corresponding responses, and therefore the Court only has before it Antonetti's un-contradicted statements as to this issue.

[12] Furthermore, Plaintiff's Statement of Material Facts in Support of his Motion for Partial Summary Judgment states that "On February 24, 2011, the matter was referred to the Lackawanna County District Attorney's Office for further assistance in a drug investigation." (Doc. 94, at ¶ 18).

2011, Plaintiff's claim that the defendants breached their fiduciary duty by not calling the police is without any evidentiary basis. Furthermore, Plaintiff has set forth no evidence to create a dispute of fact that, once the police were contacted, the defendants in any way "fail[ed] to allow the proper law enforcement authorities to conduct the investigation. . . ."

Additionally, although Plaintiff's claim is, in part, premised on an allegation that the defendants breached a fiduciary duty by allowing J.A. to return home on the day of February 24, 2011, the uncontradicted record evidence shows that Antonetti and Elia did not have some, or all, of the information which formed the basis for their detention of J.A. the following day, at the time that J.A. left school on February 24.

According to Antonetti, he was unsure of the specific time of day on February 24, 2011, that it was brought to his attention that A.W. and W.F. may have possessed marijuana, but stated that it was "at the end of the school day during dismissal time" and that he "did speak to the students after dismissal time." Antonetti further stated that J.A. "had already left school by the time [Antonetti had this information [that J.A. was allegedly involved in selling marijuana or a substance similar to marijuana]." (Dep. of Antonetti, at 24-25). Similarly, according to Elia, he first learned that J.A. was possibly in possession of "spice" on campus from another student on the "evening" of February 24, 2011, which he defined as "after 4:00". (Dep. of Elia, at 14-16). Elia and Antonetti's statements are further supported by the incident report submitted by Antonetti, found in the Juvenile Petition, stating that after first interviewing A.W., he "was allowed to return to the detention room and

then dismiss [*sic*] to the late bus." Antonetti and Elia then decided to re-interview A.W. and found him "waiting for the bus in the gym." It was during the second meeting that A.W. admitted that J.A. brought the substance to school and stated that J.A. was growing marijuana at home and that K.A. had "chronic" and was growing marijuana plants. (*See* Juvenile Petition, 2011-085, at 2). At that time, A.W.'s father was contacted and during the conversation with A.W.'s father, Elia and Antonetti became aware of the text message sent by J.A. to A.W. stating that J.A. was "going to beat the shit out of [W.F.]." (Juvenile Petition, 2011-085, at 1-2). As such, the record evidence demonstrates that Elia and Antonetti were not aware of the threatening text message until after school had been dismissed. Plaintiff has presented no deposition testimony or documentary evidence to contradict any of the evidence that J.A. had already left school for the day at the time that Elia and Antonetti first became aware that J.A. may be in possession of drugs or "spice", may be selling these substances on campus, and had threatened another student. As such, Defendants could not have breached a fiduciary duty to J.A. by allowing him to return home at the end of the day when the evidence indicates that these defendants were not aware of J.A.'s actions and involvement in A.W. and W.F.'s possession of "spice" until after school had been dismissed.

Although the Court finds that Plaintiff has failed to demonstrate a genuine dispute of fact as to whether the defendants' alleged failure to contact the proper authorities, to allow law enforcement to conduct an investigation, and to let J.A. return home on February 24, 2011, constitute breaches of the defendants' fiduciary duty, several material factual disputes

exist with respect to the question of whether Antonetti and Elia's[13] detention of J.A. for over seven hours on February 25, 2011, was a breach of a fiduciary duty.[14]

Here, Plaintiff admitted that he brought "spice" to school and that he gave the "spice" to A.W., in exchange for a debt. No party disputes that J.A. also sent a threatening text to A.W. stating "Holy shit, who is the WF, I am going to beat the shit out of him. Snitches die," and that Elia and Antonetti were aware of this text message in the afternoon or evening of February 24, 2011. Furthermore, J.A. testified that during his interviews with Antonetti, the vice-principal asked him a variety of questions, including: (1) who used drugs in the school; (2) names of students who were using drugs and possibly distributing drugs within the school district; (3) if J.A. had ever brought drugs to school before or was distributing drugs; (4) where J.A. got the "spice" at issue; (5) J.A.'s home environment, including whether there was any abuse in the home, drugs in his home, and whether his parents used drugs; and (6) the text message sent by J.A. to A.W. (Dep. of J.A., at 43, 48-59, 65).

"[A] school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule." *Wofford v. Evans*, 390 F.3d 318, 326

---

[13] As discussed, *infra*, there are no genuine disputes of material fact with respect to the breach of fiduciary claim against Kelly. Kelly is therefore entitled to summary judgment on this Count.

[14] The Court notes that several of Plaintiff's bases for his breach of fiduciary claim appear incompatible. Plaintiff argues that the defendants breached a fiduciary duty by allowing J.A. to return home after school on February 24, 2011 and not immediately contacting the police, Children & Youth Services, or another social service provider, while simultaneously arguing that the fiduciary duty was breached by the defendants when they did not immediately contact K.A. and instead detained J.A. on February 25, 2011 for questioning. Plaintiff is thus asserting on one hand that a breach occurred because it was not in J.A.'s "best interest" to return home on February 24, 2011, but on the other hand that there was a breach because J.A. should not have been detained on February 25, 2011.

(4th Cir. 2004).  The "detention must be reasonably related in scope to the circumstances which justified it in the first place.  Each case, and the reasonableness of the actions taken by school officials, turns on its particular facts."  *S.E. v. Grant Cty. Bd. Of Educ.*, 544 F.3d 633, 641 (6th Cir. 2008) (internal citations and quotation marks omitted).

As this Court previously stated in the Memorandum Opinion addressing Plaintiff's substantive due process claim in Defendants' first motion to dismiss:

> A public school has a compelling interest in preventing a child from being exposed to unlawful drug use, or other illegal activity, by his or her parents. *See [United States v. Hollingsworth*, 495 F.3d 795 (7th Cir. 2007)].  It would be irrational to assert that when a school official suspects a student of possessing, using, or distributing drugs, alcohol, or contraband, that official must always immediately contact a child's parent or guardian prior to speaking with the child and first ascertaining the surrounding factual situation. Further, by the morning of February 25, 2011, the school officials were aware of the text message from J.A. to A.W. stating "Holy shit, who is the WF, I am going to beat the shit out of him.  Snitches die."  (Doc. 21, Ex. A, at 4). Here, Abington Heights, and its officials, had reason to be concerned not only for the welfare and safety of J.A. at home, but also for the impact on other students to whom J.A. was giving and/or selling the contraband, as well as the physical safety of another student.  *See New Jersey v. T.L.O.*, 469 U.S. 325, 339-340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. . . . Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult. Events calling for discipline are frequent occurrences and sometimes require immediate, effective action.  Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship") (internal citations omitted)).

*K.A. v. Abington Heights Sch. Dist*, 28 F.Supp.3d 356, 373-374 (M.D. Pa. 2014).[15]

Applying the elements required under Pennsylvania law to establish a breach of fiduciary duty, the school employees' duty must extend to each individual child – to say that the defendants owed J.A. a fiduciary duty at the expense of all other students in the school would, in the present case, result in a breach of those defendants' fiduciary duties owed to each of the other AHSD students. At the time that Kelly brought J.A. to Antonetti's office on February 25, 2011, the record evidence demonstrates the following:

- Antonetti and Elia had already spoken to A.W. and W.F. and had reason to believe that J.A. was the source of the "spice" discovered the prior day, and that J.A. may have been selling the substance on campus (*see e.g.*, Dep. of Antonetti, at 21-24);

- According to Officer Davis' Affidavit of Probable Cause, during the principal and vice-principal's conversation with A.W. on February 24, 2011, that student told them that J.A. "is growing marijuana plants in his home" and that J.A.'s mother had "chronic" and was growing "big marijuana plants" (Affidavit of Probable Cause, Feb. 25, 2011, at 4; Juvenile Petition, 2011-085, at 1); and

---

[15] No party has provided case law clarifying what specific fiduciary duty under Pennsylvania law a school district employee owes to a student. Therefore, although the Court acknowledges that the above case-law regarding detention of a student is all set forth when addressing Constitutional claims, namely Fourth and Fourteenth Amendment causes of action, the underlying reasoning with respect to Plaintiff's state law claim remains largely the same; to wit, a school employee such as a teacher, counselor, or administrator may detain a student for a reasonable amount of time without violating that student's state law rights if, in light of the specific facts of the case, such a detention serves the best interest of the students.

- Antonetti and Elia were aware of a text message from J.A. to A.W. threatening the life of another student (*see e.g.*, Affidavit of Probable Cause, Feb. 25, 2011, at 4; Juvenile Petition, 2011-085, at 1).

This evidence alone is sufficient to establish that the defendants did not breach any fiduciary duty in their initial detention of J.A. Rather, the school district employees fulfilled their duty to J.A. by attempting to ensure his personal safety by determining whether J.A. was (1) using drugs, (2) being exposed to the presence of drugs at home, and (3) in danger due to his mother and/or fiancé's alleged drug use at home. The school officials' detention was further justified by their duty to protect the other students in the school, namely by determining whether (1) J.A. was selling drugs on campus to other students, (2) whether there were other people selling and/or distributing drugs on campus, and (3) whether J.A. posed a physical threat to any other student, and W.F. in particular.

Nonetheless, while the detention and questioning of J.A. for a reasonable period of time does not breach a fiduciary duty when such detention and questioning is done to ensure the well-being and safety of both J.A. and the other students to whom the school district employees owed a duty, several disputes of material fact exist with respect to the length of the detention. Viewing the evidence in the light most favorable to Plaintiff, J.A. was detained at school for over seven hours. In her deposition, K.A. stated that J.A. did not return home on the school bus as he was supposed to that day, prompting her to call the school at 2:30 p.m.

and being told by Antonetti that she needed to come to the school at 3:30 p.m.[16]  (Dep. of

K.A., at 22).  During Antonetti's deposition, Antonetti explained the process he follows when

conducting an investigation into violations of school policy as follows:

> **Q**. . . . So let's talk more about a violation of policy or something like that that
> involves you.  How would you conduct your investigation according to the
> guidelines and policies that were in place at the time of 2010 through 2015?
>
> **A**. My number one -- the steps that I would follow first to make sure that the
> student was safe, address any safety concerns first, secure and document
> any evidence collected. If I had to conduct a search of a student, I would have
> another staff member present with me and I would follow verbal protocols for
> doing that. I would notify the building principal.
> Then depending on the situation I might have to interview students or
> teachers to get additional information. In the general sense we have to figure
> out what happened to try to determine that to the best of my ability to make a
> decision and then to communicate that to my supervisors and the student's
> parents.
>
> **Q**. And when would you confer with the student's parents?
>
> **A**. Depending on the situation once I had enough information to -- that I felt
> was credible to share with the parents.
>
> **Q**. If you just refer to the document before you on page 28, item number 2-B
> states if a drug was found, contact will be made with the student's parents.
> Can you state at what point of the process that you typically reach out to the
> parents?
>
> **A**. Normally once I had conducted the investigation and had information to
> share with the parents. . . .

---

[16] Accepting as true that J.A. was brought to Antonetti's office at or around 7:45 a.m. and K.A. spoke with Antonetti at or around 2:30 p.m., J.A. had been detained for slightly less than seven hours at the time K.A. was first informed that she needed to come to the school. Plaintiff's calculation that J.A. was detained for seven and a half hours therefore appears to be the time from which J.A. was approached by Kelly to the time K.A. arrived at J.A.'s school.

(Dep. of Antonetti, at 12-13).  Furthermore, Elia explained that, "as a general practice", the parents are notified of an investigation involving possible possession of drugs by their child "usually at the conclusion of the investigation", which can "range from an hour" to "several hours or it can take all day depending on how many parties and how many students are involved."  (Dep. of Elia, at 9-10).  On the day in question, Elia has explained that it was not until after dismissal that he "felt we were to the point where we could accurately give the mother all the information, and really that's how long it took to gather all that information." (*Id*. at 21).

Nonetheless, in his deposition, J.A. testified that Antonetti used an "abrupt" tone and that J.A. cried "two or three times" during Antonetti's questioning of him because it was "a little overwhelming to be asked questions a whole day in an office" and that it was upsetting for him to be providing information about his parents.  (Dep. of J.A., at 71, 73-74).

Even accepting as true Antonetti's statements with respect to the process he follows when conducting an investigation into a violation of school policy, and Elia's statement that the investigation was not complete until approximately the time that K.A. called the school, material factual disputes exist with respect to whether the defendants breached their fiduciary duty by (1) detaining J.A. for the entire school day, or whether he could have been released earlier, and (2) by not contacting K.A. earlier in the course of the school day. There is further a factual issue for the trier of fact as to whether defendants breached a fiduciary duty to J.A. by detaining him past the end of the school day without attempting to

notify a parent that he was detained. (*See* Dep. of Elia, at 20 (admitting that J.A.'s parent was not contacted "at the point of dismissal from school" and that K.A. was spoken to "shortly after dismissal.")). A fact specific inquiry requires that a trier of fact balance Antonetti and Elia's actions and need to protect J.A. and other students in the school, with the fact that J.A. was 13-years old at the time and purportedly upset throughout the day, in order to determine whether Antonetti and/or Elia breached his fiduciary duty to J.A. by negligently failing to act in good faith and solely for the benefit of J.A. and/or negligently failed to use reasonable care in carrying out his duties. However, although certain factual disputes remain as to whether Antonetti and/or Elia breached his fiduciary duty to J.A., these disputes only raise the question of whether the conduct at issue was negligent. Even affording Plaintiff the benefit of every inference, there is no record evidence from which a reasonable trier of fact could determine that the defendants intentionally failed to act in good faith and solely for the benefit of J.A. and/or intentionally failed to use reasonable care in carrying out their duties.

Thus, a genuine dispute of fact exists as to whether Antonetti and/or Elia breached their fiduciary duty by detaining J.A. for the period of time alleged. Specifically, the issues in dispute are (1) whether it was necessary to detain J.A. for over seven hours or if J.A. could have been released earlier in the day to a parent or guardian, following an initial investigation and/or interrogation; (2) whether Antonetti and/or Kelly breached their fiduciary

duty by never calling J.A.'s mother;[17] and (3) if J.A. was detained longer than necessary, whether a fiduciary duty was breached when J.A. was kept in excess of the school day and the time he was expected to be in school.

The Court next turns to Plaintiff's breach of fiduciary claim against Kelly. Here, it is undisputed that Kelly was employed as the school counselor of the Abington Heights Middle School from 2007 and 2011 (Doc. 94, at ¶ 7; *see also*, Doc. 97, at ¶ 96).[18] Kelly reported to the vice-principal, Antonetti and/or principal Elia. (*See* Dep. of Antonetti, at 6 (explaining that his "primary duties [as vice-principal] were to assist the principal with the supervision of all staff and faculty . . . .")). It is also undisputed that on February 25, 2011, when J.A. arrived to school by bus at 7:45 a.m. he was approached by Kelly, his counselor, who escorted him with his belongings to vice-principal Antonetti's office. (Doc. 94, at ¶ 20). Kelly testified that he had "conversations with the administration and they asked [him] to assist and bring[] [J.A.] up to the main office when they would like to question him." (Dep. of Kelly, at 14). Kelly also stated that, when asked by J.A. if he was in trouble, he explained that "as a school counselor . . . [he did not] know much about what's going on", and told J.A. that "it's best to be truthful." (Dep. of Kelly, at 15). According to J.A., the first

---

[17] K.A.'s deposition testimony that she was the one who first contacted the school after her son did not get off the school bus at the end of his school day is troubling. Although, at best, Elia testified that "as [Antonetti] was going to call [K.A.], she called in" (Dep. of Elia, at 21), it is undisputed that K.A. contacted the school first and it would be for a trier of fact to determine the credibility of Elia's statement and to determine when the school officials actually intended to contact J.A.'s parent.

[18] Although Plaintiff does not dispute Defendants' statement of material fact stating that Kelly was employed at Abington Heights Middle School until 2011, Kelly clarified in his deposition that he left in 2012, not 2011 (Dep. of Kelly, at 11).

conversation he had with Antonetti upon being taken to his office by Kelly lasted ten or fifteen minutes, and Kelly was present for that meeting. (Dep. of J.A., at 43). J.A. further testified that Kelly was not present at the second meeting that day between J.A. and Antonetti and there is no testimony by J.A. that Kelly was present during any other meetings between J.A. and Antonetti during the course of that day. (*See* Dep. of J.A. at 49; *see also*, *id. generally*). According to Kelly's deposition, after the first interview, Kelly "checked on [J.A.] periodically to make sure he had lunch, if he needed to take a walk or go to the bathroom, things like that." (Dep. of Kelly, at 16).

Assuming a fiduciary duty existed between Kelly and J.A., Plaintiff has failed to set forth any evidence of a breach by Kelly. As previously discussed, Plaintiff's claim is premised on (1) a failure to call the "proper authorities" on February 24, 2011 and/or February 25, 2011; (2) detaining J.A. for over seven hours; and (3) failing "to allow the proper law enforcement authorities to conduct the investigation and by conducting the same themselves . . . without any consideration for the effect said investigation have on J.A.'s relationship with his parents and his public school." Plaintiff has not presented any evidence to support his claim that Kelly's actions breached a duty with respect to any of these allegations. Although Kelly brought J.A. to Antonetti's office, no reasonable jury could find that Kelly was responsible for J.A. remaining in the in-school suspension room or Antonetti's office for the rest of the school day. Rather, Kelly was merely acting at the request of his superiors. There is also no evidence that Kelly either conducted the

investigation or in any way prevented the law enforcement authorities from conducting an investigation. Finally, Plaintiff has set forth no evidence to establish, or create a factual dispute, that Kelly bore any responsibility for calling the "proper authorities", and in particular in light of the record evidence establishing that the police were contacted on both February 24 and February 25, 2011. Thus, because the police had already been contacted, there could be no duty on the part of Kelly to contact the "proper authorities" or for "failing to allow the proper law enforcement authorities to conduct the investigation."

For the foregoing reasons, the Court must deny Defendants' argument that summary judgment should be granted in favor of Antonetti and Elia on the ground that no disputes of material fact exist with respect to Plaintiff's breach of fiduciary duty claim; however, because no genuine factual disputes exist with respect to Kelly, the Court will grant summary judgment in favor of Kelly on Plaintiff's claim for breach of fiduciary duty.

### 2. The Political Subdivision Tort Claims Act

Defendants also assert that the individual defendants are entitled to immunity pursuant to the Political Subdivision Tort Claims Act. (Doc. 98, at 6-7). Pursuant to the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. § 8541 *et seq*. ("PSTCA"), a local agency cannot be held "liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. Ann. § 8541. The Act provides for eight exceptions to this rule: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees,

traffic controls and street lighting; (5) utility services facilities; (6) streets; (7) sidewalks; and

(8) care, custody or control of animals.  42 Pa. Cons. Stat. Ann. § 8542(b).  Additionally,

> [m]unicipal employees, including school district employees, are generally
> immune from liability to the same extent as their employing agency, so long
> as the act committed was within the scope of the employee's employment.  42
> Pa. Cons.Stat. § 8545.  However, there is an exception to this general rule:
> Employees are not immune from liability under § 8545 where their conduct
> amounts to 'actual malice' or 'willful misconduct'. . . .

*Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006).  The Pennsylvania Supreme Court has

recognized willful misconduct as requiring a demanding level of fault.  *Id*.  "Willful

misconduct has been defined by the Pennsylvania Supreme Court as 'conduct whereby the

actor desired to bring about the result that followed or at least was aware that it was

substantially certain to follow, so that such desire can be implied.'"  *Id.* (quoting *Renk v. City

of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994)).  "[E]ven where a public employee acts with a

degree of culpability equivalent to 'recklessness,' Pennsylvania law nevertheless affords

him immunity."  *Bright v. Westmoreland Cty.*, 443 F.3d 276, 287 (3d Cir. 2006) (finding that

an allegation of deliberate indifference is not sufficient to avoid PSTCA immunity).

Here, Plaintiff admits that none of the eight exceptions to the PSTCA apply.  (*See*

Doc. 103, at 4). Thus, Plaintiff must have presented evidence to create a material factual

dispute as to whether the individual school defendants' conduct could amount to actual

malice or willful misconduct.

Affording Plaintiff the benefit of every reasonable inference to be derived from the

evidence of record, under any reasonable application of the exception to immunity under the

PSTCA, the defendants cannot be said to have acted with malice or reckless disregard of J.A.'s rights. At most, J.A. was detained in the in-school suspension room and his parents not contacted until after school was dismissed. Plaintiff has presented no evidence from which a reasonable jury could find that the conduct of one or more of the defendants rises to the demanding level of fault required to lift the immunity protections of the PSTCA. Specifically, there is no record evidence that Antonetti and/or Elia exhibited anything more than negligence in their actions or inactions taken on February 24 and 25, 2011 when they investigated and questioned J.A.[19]

Elia, Antonetti, and Kelly are therefore entitled to immunity pursuant to the PSTCA with respect to Plaintiff's claim for breach of fiduciary duty.

### D. Count III – Punitive Damages

With respect to Plaintiff's punitive damages claim (Count III) against Elia, Antonetti, and Kelly, Defendants assert that they are entitled to summary judgment on this claim based on the Coverdell Act and because Plaintiff has failed to produce evidence to support a punitive damage claim against the defendants. (Doc. 96, at ¶¶ 55-61).

---

[19] With respect to Kelly, Plaintiff has offered no evidence to create a material dispute that Kelly's limited conduct, specifically bringing J.A. to Antonetti's office and presence during Antonetti's first brief interview of J.A. in his office, was performed with the "desire[] to bring about the result that followed" or that Kelly was aware that a particular result "was substantially certain to follow." Furthermore, according to Kelly, throughout the day, he "checked on [J.A.] periodically to make sure he had lunch, if he needed to take a walk or go to the bathroom, things like that." (Dep. of Kelly, at 16). In turn, J.A. only stated that he could not recall if Kelly returned during the day after the initial interview in the morning with Antonetti. (Dep. of J.A., at 68). To say that Kelly acted with anything approaching recklessness or deliberate indifference would defy common-sense.

In Pennsylvania, punitive damages "are awarded only for outrageous conduct, that

is, for acts done with a bad motive or with a reckless indifference to the interests of others."

*SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991) (quoting *Chambers v.*

*Montgomery*, 192 A.2d 355, 358 (1963)).

> Punitive damages may be awarded for conduct that is outrageous, because of
> the defendant's evil motive or his reckless indifference to the rights of others.
> Punitive damages must be based on conduct which is 'malicious,' 'wanton,'
> 'reckless,' 'willful,' or 'oppressive'.  Further, one must look to the act itself
> together with all the circumstances including the motive of the wrongdoers and
> the relations between the parties.  The state of mind of the actor is vital. The
> act, or the failure to act, must be intentional, reckless or malicious.

*Feld v. Merriam*, 485 A.2d 742, 747-748 (Pa. 1984) (internal citations and quotation marks

omitted). Furthermore, "a showing of mere negligence, or even gross negligence, will not

suffice to establish that punitive damages should be imposed."  *Phillips v. Cricket Lighters*, 883

A.2d 439, 445 (Pa. 2005) (citing *SHV Coal, Inc. v. Continental Grain Co.,* 587 A.2d 702, 705

(Pa. 1991)).  Thus, to succeed on a claim for punitive damages, a plaintiff must produce

sufficient evidence to establish that "(1) a defendant had a subjective appreciation of the risk of

harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may

be, in conscious disregard of that risk." *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).

For the reasons discussed above with respect to breach of fiduciary duty, Elia,

Antonetti, and Kelly, are all immune from this claim pursuant to the PSTCA.  However, even

in the absence of this immunity, Plaintiff has failed to present evidence demonstrating a

material issue of fact as to these defendants' appreciation of the risk of harm to Plaintiff or a conscious disregard of that risk.

Plaintiff's brief in opposition to Defendants' motion for summary judgment does not specifically address the merits of his punitive damages claim. Instead, Plaintiff only argues that Count III should not be dismissed because the Coverdell Act does not immunize the defendants. (Doc. 103, at 7-8). Further, in support of this argument, Plaintiff states that "the Defendants, most notably Superintendent Mahon, failed to comply with the procedural safeguards available to J.A. under Section 504 of the Rehabilitation Act . . . ." (*Id*. at 8). This argument is significantly undermined by the fact that Plaintiff's claim for Punitive Damages against Mahon was dismissed with prejudice by this Court's Order of April 20, 2014 (Doc. 64) and no claims remain pending against Mahon in this action.

According to Plaintiff's Second Amended Complaint,

Defendants' reckless, outrageous, wanton, willful and malicious behavior include, but is not limited to:
(a) depriving Plaintiff of his due process right for over a year, during which period he was subject of the most severe of penalties, removal from school;
(b) restraining the student's liberty for over 7 ½ hours during which period, J.A.'s parents were never notified.
(c) Continuing for over 24 hours a course of conduct that resulted in the student being the subject of a public investigation which has irreparably harmed his relationship with his family.

(Doc. 47, at ¶ 175). Plaintiff further alleges that "[t]hese acts and others, the Defendant Administrators and counselors knew or should have known would result in psychological injury to J.A. and his mother, K.A." (*Id*. at ¶ 176).

Elia, Antonetti, and Kelly, cannot be held responsible for any of the specific claims Plaintiff asserts constitute a basis for punitive damages. With respect to a "deprivation" of Plaintiff's due process rights for over a year as a result of Plaintiff's expulsion, none of the aforementioned Defendants can be said to be responsible for the decision to expel Plaintiff. Rather, according to Mahon, "if a student is recommended to be expelled, it would be at that point regardless of a disability that the matter would be reported and referred to [Mahon]." (Dep. of Mahon, at 34). Ultimately however, it was the Abington Heights Board of School Directors who voted to expel J.A. for a violation of an AHSD policy. (*See* Adjudication – In Re: The Matter of Jacob Anderson, Student No. 103724). To the extent that Plaintiff's claim is premised on the undisputed fact that J.A. did not receive another hearing prior to the expulsion hearing, it was Mahon, and not any of the current defendants, who made the determination that J.A.'s ADHD was not manifested in the behavior at issue, and thus arguably deprived J.A. of his right to another hearing. (*See* Dep. of Mahon, at 59-60).

As to Elia, Antonetti, and Kelly's "restraint" of J.A.'s liberty for over 7 hours and failure to call J.A.'s parents, although issues of fact as to the appropriateness of this behavior on the part of Elia and Antonetti remain as to the breach of fiduciary duty claim,[20] Plaintiff has presented no evidence from which a reasonable trier of fact could determine that the defendants' conduct was "outrageous" or "intentional, reckless or malicious."

---

[20] While a breach of fiduciary claim may be premised on negligent conduct, a much higher degree of fault must be met in order to succeed on a claim for punitive damages. As such, the existence of material factual disputes with respect to the fiduciary duty claim does not preclude the grant of summary judgment on the punitive damage claim.

Third, Plaintiff's claim that the defendants "continu[ed] for over 24 hours a course of conduct that resulted in the student being the subject of a public investigation", thus subjecting them to punitive damages, is without merit or evidentiary support.  J.A. does not dispute that brought the "spice" to school and gave it to another student or that he sent a text message threatening to harm W.F.  Elia and Antonetti owed a duty to both J.A. and the other AHSD students to investigate the claims against J.A. and ensure that J.A. was not subject to an unsafe home life and the other students were not in danger.  The fact that Plaintiff believes there was a more appropriate way to conduct this investigation, without more, does not refute Defendants' assertion that Elia and Antonetti's actions, or inactions, were not the result of an intentional, reckless, or malicious state of mind. Furthermore, these defendants cannot be held responsible for any harm in the personal relationship between J.A. and his family, particularly when it is undisputed that K.A. and her fiancé did have marijuana in the house.  The school defendants cannot be held liable for the undisputed actions of J.A. and his family, the discovery of which by the school officials purportedly harmed the private relationship between the family members.

Finally, to the extent that Plaintiff's claim for punitive damages against Elia, Antonetti, and Kelly is premised on any other conduct by the defendants, it is not immediately clear what conduct Plaintiff believes rises to the level of intentional, reckless, or malicious, and Plaintiff does not specify any particular conduct in his brief in opposition to Defendants' motion for summary judgment.

For the aforementioned reasons, Defendants' motion for summary judgment with respect to Plaintiff's punitive damage claim will be granted.

## E. The Coverdell Act

Defendants further argue that the Coverdell Act requires dismissal of all claims against the individual defendants.  (Doc. 96, at ¶¶ 50-54).

The Coverdell Act, 20 U.S.C. §§ 6731 *et seq.*, immunizes teachers, principals, and other school professionals from liability when "undertak[ing] reasonable actions to maintain order, discipline, and an appropriate educational environment", stating that "no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school."  *Id*. at §§ 6732, 6736.  Immunity is available when "the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher."  *Id*. at § 6736(a)(4).  Immunity is unavailable if Defendants failed to comply with federal, state, or local laws.  The Court need not determine here whether this immunity would apply as summary judgment will be granted to the individual defendants on other grounds.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment (Doc. 96) and deny Plaintiff's Motion for Partial Summary Judgment (Doc. 93). A separate Order follows.

Robert D. Mariani
United States District Judge